**EXHIBIT**

**A**

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

COPY

STATE OF MICHIGAN

JUDICIAL CIRCUIT COURT ISABELLA COUNTY

IN THE MATTER OF THE PETITION OF
THE ISABELLA COUNTY TREASURER,
                Plaintiff

v                                   File No.  14-11664-CF and
                                              12-10050-CF

ISABELLA

                Defendant
                                    /

MOTION TO SET ASIDE FORECLOSURE, OR IN THE ALTERNATIVE, FOR WRIT OF
MANDAMUS TO FORCE PETITITONER TO CANCEL FORECLOSURE
BEFORE THE HONORABLE PAUL H. CHAMBERLAIN, CHIEF JUDGE
Mount Pleasant, Michigan - Thursday, August 20, 2015

APPEARANCES:

For the Plaintiff:  MR. THOMAS W. HALL, JR.  P14552
                    Attorney at Law
                    300 South University Avenue
                    Mount Pleasant, Michigan 48858
                    989-773-0004

For the Defendant:  MR. ANTHONY G. COSTANZO, P33538
                    Attorney at Law
                    214 East Superior Street
                    Alma, Michigan 48801
                    989-463-2101

Recorded by:        Maegan Long, Court Clerk

Transcribed by:     Ms. Shelly A. Smalley, CER 8076
                    Certified Electronic Recorder
                    989-772-0911

1

TABLE OF CONTENTS

| Witnesses: | Page |
|---|---|
| Steven Pickens | |
| Direct examination by Mr. Hall | |
| (continued from 6/22/15 hearing) | 4 |
| Cross-examination by Mr. Costanzo | 22 |
| Redirect examination by Mr. Hall | 89 |
| Recross-examination by Mr. Costanzo | 92 |
| Patricia DePriest | |
| Direct examination by Mr. Hall | 39 |
| Cross-examination by Mr. Costanzo | 42 |
| Elaine Andres | |
| Direct examination by Mr. Hall | 57 |
| Mike Pung | |
| Direct examination by Mr. Hall | 61 |
| Cross-examination by Mr. Costanzo | 64 |
| Redirect examination by Mr. Hall | 81 |
| Recross-examination by Mr. Costanzo | 86 |

| EXHIBITS | Identified | Admitted |
|---|---|---|
| PL EX#6 - Tax foreclosure process | 5 | 5 |
| PL EX#7 - Notice of pending forfeiture | 7 | 7 |
| PL EX#8 - Certificate of forfeiture | 8 | 8 |
| PL EX#10 - Petition | 9 | 9 |
| PL EX#10 - Affidavit | 9 | 11 |
| PL EX#11 - Photo | 11 | 11 |
| PL EX#12 - Minutes of show cause hearing | 12 | 13 |
| PL EX#13 - Affidavit of publication | 14 | 14 |
| PL EX#14 - Amended petition | 15 | 15 |
| PL EX#15 - Letter regarding foreclosure | 16 | 17 |
| PL EX#16 - Letter from Pung to tribunal | 61 | 63 |
| PL EX#17 - Letter from tribunal to Pung | 62 | 64 |
| PL EX#18 - Letter/response | 63 | 64 |
| DA EX#19 - Tax bill | 74 | 75 |
| DA EX#20 - Adjusted tax bill | 75 | 76 |
| PL EX#21 - Letter 2/22/13 | 81 | 82 |
| PL EX#22 - Notice | 91 | 91 |
| PL EX#23 - Delinquent tax notice | 89 | 90 |
| PL EX#24 - Tax bill with cleared check | 88 | 88 |

2

1   Mount Pleasant, Michigan

2   Thursday, August 20, 2015 - 1:17 p.m.

3          THE COURT: File numbers 12-10050-CF and 14-11664-CF,

4   In the matter of the Petition of the Isabella County

5   Treasurer.  Counsel, if you'll identify yourselves for the

6   record.

7          MR. HALL: May it please the court, Thomas W. Hall,

8   Junior, I represent the Isabella County Treasurer, Mr.

9   Pickens.

10         MR. COSTANZO: May it please the court, Your Honor,

11  Anthony Costanzo on behalf of the Estate of Timothy Scott

12  Pung.

13         THE COURT: You may proceed, counsel.

14         MR. HALL: Your Honor, at -- we left off on the 22nd

15  of June with Mr. Pickens on the stand, so I would recall Mr.

16  Pickens.

17         THE COURT: I'll remind you you're under oath.

18         MR. COSTANZO: Your Honor, before we get started, Mr.

19  Hall indicated to me when he came in here he has two

20  additional witnesses.  He mentioned something about

21  sequestration and I would appreciate it if the court would

22  order that witnesses be sequestered.

23         MR. HALL: Yes we have two additional witnesses,

24  Elaine Andres and Patricia DePriest.

25         THE COURT: All right, I'll order sequestration of

3

1   the witness, if all witnesses will proceed to the hall, not

2   discuss the case among yourselves or with anyone else until

3   it's concluded, and you can go to the hall at this time.

4                      DIRECT EXAMINATION

5   By MR. HALL:

6   Q   For the record again, state your name, sir.

7   A   Steven Pickens.

8   Q   Steve, as the Isabella County Treasurer you are the petitioner

9       in the 2012 case that the court cited and the 2014 case that

10      the court cited, is that correct?

11  A   As the foreclosing governmental unit, correct.

12  Q   Is it your understanding that this particular motion and case

13      does not affect the 2012 case?  In other words; I'm not sure

14      why we're calling the 2012 case, but this is regarding the

15      2014 case which is a motion pertaining to simply the 2012

16      foreclosure, correct -- the foreclosure of the 2012 taxes?

17  A   Correct.

18  Q   That's your understanding as well?

19  A   Yes.

20  Q   Okay.  Now you were, when we completed the last hearing, you

21      were going through the notice process that at that time the

22      treasurer -- treasurer's office had engaged in with regard to

23      this tax forfeiture of the property at issue, correct?

24  A   Correct.

25  Q   I'm going to show you what's been marked exhibit number six

4

**Page 5**

```
 1        and ask you if you're familiar with that document?
 2  A     Yes, sir.  It is the tax foreclosure process, the timeline
 3        that we fill out, it tells the steps, identifies the steps
 4        that we take for notices.
 5              (At 1:21 p.m., exhibit six identified)
 6  Q     Now in this particular case, is that a document that was
 7        prepared by your office?
 8  A     Correct.
 9  Q     And does it reflect what your files and records indicate were
10        the dates in which the item to the right of the specific date
11        was done?
12  A     Correct.
13  Q     And that's based upon your files and records, correct?
14  A     Yes.
15  Q     And does that reflect then each of the items of notice and the
16        process by which the 2012 taxes were foreclosed, not only on
17        the Pung property, but on all the 2012 foreclosures?
18  A     Yes.
19              MR. HALL: Move for the admission of six.
20              THE COURT: Any objection?
21              MR. COSTANZO: No, Your Honor.
22              THE COURT: Exhibit six is admitted.
23              (At 1:22 p.m. exhibit six is admitted)
24  BY MR. HALL:
25  Q     Now in the course of this process that was represented by
```

5

**Page 6**

```
 1        exhibit six, a notice of pending forfeiture was submitted to -
 2        - or since mailed to each of the property addresses on or
 3        about January 13, 2014, correct?
 4  A     Correct.
 5              MR. HALL: I'm going to show you this --
 6              THE COURT: Do you have some more that you need to
 7        mark --
 8              MR. HALL: Yes I do --
 9              THE COURT: -- Mr. Hall?
10              MR. HALL: -- but not very many.
11              THE COURT: Why don't we just take a brief recess
12        then and we'll get them marked.
13              (At 1:22 p.m., court in recess)
14              (At 1:40 p.m., court reconvened)
15              All right, we'll go back on the record in the Matter
16        of the Petition of the Isabella County Treasurer, you may
17        proceed.
18              MR. HALL: Thank you, Your Honor.
19  BY MR. HALL:
20  Q     Mr. Pickens, in front of you I have exhibit -- proposed
21        exhibit number seven and ask if that's something that came
22        from your file as well?
23  A     Correct.
24  Q     And with regard to this property, was that a notice that was
25        also mailed out in the course of the tax foreclosure process
```

6

**Page 7**

```
 1        on this property?
 2  A     Yes, on 1/13/14 we sent out notices; the third notice
 3        according to 21178F1, this is F two. F two is distinguished
 4        that it goes to the property address, F one is (inaudible)…
 5        parties.
 6              (At 1:41 p.m., exhibit seven identified)
 7  Q     You're citing from the statutory subsections, is that what
 8        you're referring to?
 9  A     Correct.
10  Q     So in this case, on your tax foreclosure timeline that has
11        been admitted into evidence, there's a January 13th third
12        notice mailing that was a previous exhibit and this one is the
13        January 13, '14, notice of pending forfeiture sent to property
14        address, is that correct?
15  A     Correct.
16  Q     And it was sent to the address of Mr. Pung at the Saint
17        Andrews Drive property that is the location of the actual
18        property, is that correct?
19  A     Yeah, the proof of mailing --
20  Q     Yeah.
21  A     -- (inaudible)… says to Timothy S. Pung, one to the Blue
22        Herron and the current residence at the Saint Andrews address.
23              MR. HALL: Move for the admission of seven.
24              MR. COSTANZO: No objection.
25              THE COURT: Seven is admitted.
```

7

**Page 8**

```
 1              (At 1:41 p.m., exhibit seven is admitted)
 2  BY MR. HALL:
 3  Q     I'll show you exhibit number eight.  Another document also
 4        coming from your file showing that you recorded with the
 5        Register of Deeds the certificate of forfeiture?
 6              (At 1:42 p.m. exhibit 8 identified)
 7  A     Correct.
 8  Q     And that was also -- was that done on or about, well it's on
 9        the document I guess --
10  A     Four one fourteen.
11  Q     And it has the file stamp of the register of deeds, is that
12        correct?
13  A     That is correct.
14  Q     That is just a copy from your file though?
15  A     Correct.
16              MR. HALL: Move for the admission of number eight.
17              MR. COSTANZO: No objection, Your Honor.
18              THE COURT: Eight is admitted.
19              (At 1:42 p.m., exhibit eight is admitted)
20  BY MR. HALL:
21  Q     Then you in fact file a petition for -- of -- petition of
22        foreclosure with this court in this case on June 11, 2014, is
23        that correct?
24  A     Correct.
25  Q     Now exhibit number nine is a file stamped copy of that
```

8

```
 1   document?
 2 A Yes.
 3         (At 1:42 p.m., exhibit nine identified)
 4 Q Attached to it is a listing of this -- of, among others, but
 5   this property as well identifying it as one of the subject
 6   matters of the petition?
 7 A Correct.
 8 Q And that's as filed with the court?
 9 A Yes.
10         MR. HALL: Move for the admission of ten?
11         MR. COSTANZO: No objection, Your Honor.
12         THE COURT: Ten is admitted.
13         MR. HALL: Exhibit number -- I'm sorry, that was
14   nine, Your Honor, I apologize.
15         THE COURT: It is marked nine, nine is admitted.
16         (At 1:43 p.m., exhibit nine is admitted)
17 BY MR. HALL:
18 Q Yes, nine, this is ten.  Ten is an affidavit, at least a copy
19   of an affidavit signed by you, is that correct.
20 A Yes.
21         (At 1:43 p.m., exhibit ten is identified)
22 Q Now you signed that affidavit indicating that you had done a
23   personal visit to the property?
24 A Yes.
25 Q When did that personal visit occur, do you recall?
```

9

```
 1 A November 13, 2014.
 2 Q Okay.  And in the course of conducting a personal visit on the
 3   property you are required to either first of all; visit the
 4   property and then serve the individual who was at the premises
 5   if possible?
 6 A Yes, we're supposed to inspect to see if it is inhabited and
 7   we're supposed to place -- try to talk to them, explain the
 8   situation.  If we don't get an answer at the door then we're
 9   supposed to post. And I have a red packet that we put them
10   into, and we post that in a very conspicuous place, which in
11   this case was on the front door, and I take a picture of that
12   as well.
13 Q You did in this case as well?
14 A Yes, correct.
15 Q And okay so then that affidavit is -- follows and goes into
16   the file, is that correct?
17 A Yes.
18 Q Does that get filed with the court or not do you recall?
19 A No this is (inaudible due to hitting microphone)… we sign an
20   affidavit of personal visit, publication and things all on
21   one.
22         MR. HALL: Okay.  So I'm going to move for the
23   admission of ten.
24         MR. COSTANZO: No objection.
25         THE COURT: Ten is admitted.
```

10

```
 1         (At 1:45 p.m., exhibit ten is admitted)
 2 BY MR. HALL:
 3 Q Exhibit number 11.  And, Mr. Pickens, did you take that
 4   photograph?
 5         (At 1:45 p.m., exhibit number 11 identified)
 6 A Yes I did.
 7 Q And do you recall what date you took that photograph?
 8 A The same day that I did the personal visit.
 9 Q Okay, on November 13, 2014?
10 A Correct.
11 Q And that is a picture of the subject property that we're
12   dealing with in this case?
13 A On Saint Andrews, yes.
14 Q Okay.  And does that depict anything on the front door?
15 A That is the notice that we placed there in a conspicuous place
16   as required.
17 Q That is the notice you just testified about that was --
18 A Correct.
19 Q -- posted on the door?
20 A Correct.
21         MR. HALL: Move for the admission of 11.
22         MR. COSTANZO: No objection, Your Honor.
23         THE COURT: Eleven is admitted.
24         (At 1:46 p.m., exhibit 11 is admitted)
25 BY MR. HALL:
```

11

```
 1 Q     Now in the course of this process again, I think we've
 2   already got the fourth notice was sent certified mail and at
 3   that time a notice of show cause hearing was scheduled and
 4   that's part of that package that went out with the fourth
 5   notice, correct?
 6 A Correct.
 7 Q And then did you conduct the show cause hearing?
 8 A Correct, yes I did.
 9 Q I'm going to show you what's marked as exhibit number 12 and
10   ask if that is evidence of the -- is that the minutes of the
11   show cause hearing?
12 A Yes.
13         (At 1:46 p.m., exhibit 12 identified)
14 Q And they were prepared by your office?
15 A Correct.
16 Q And they reflect that a show cause hearing was held in this
17   case on November 22, 2015?
18 A January --
19 Q I'm sorry, I said November.  I looked --
20 A January 22 --
21 Q -- at the one and I made it an 11.
22 A January 22, 2015, correct.
23 Q Okay, so January 22, 2015, you did in fact conduct that show
24   cause hearing is that correct?
25 A Correct.
```

12

**Page 13**

```
 1  Q   And you were present for that?
 2  A   I am, yes.
 3  Q   And you're the one that actually conducts the hearing?
 4  A   As the F-G-U, yes.
 5  Q   And did anybody appear at that hearing with regard to this
 6      particular property that's the subject matter of this lawsuit?
 7  A   No, we have listed all the people that appeared.
 8              MR. HALL: Okay, move for the admission of -- I think
 9      that's 12.
10              MR. COSTANZO: No objection, Your Honor.
11              MR. HALL: And then as a part of --
12              THE COURT: Twelve is admitted.
13              (At 1:47 p.m., exhibit twelve is admitted)
14              MR. HALL: I apologize, Your Honor.
15  BY MR. HALL:
16  Q   I'm going to show you what's been marked as number -- exhibit
17      number 13 and ask if that is reflected -- if that came from
18      your file?
19  A   Yes it is.
20  Q   And is in fact that a affidavit of publication, a copy of the
21      affidavit of publication showing that the foreclosure of the
22      properties identified on the attached newspaper --
23  A   Yes --
24  Q   -- was in fact published by the Morning Sun in Isabella
25      County?
```

13

**Page 14**

```
 1              (At 1:48 p.m., exhibit 13 identified)
 2  A   By statute three consecutive weeks, correct.
 3  Q   Okay. And the publication in this occurred on the 7th, 14th and
 4      21st of January, 2015, is that right?  The 7th, 14th and 21st.
 5  A   Yes.
 6  Q   That's what the affidavit says anyway?
 7  A   Yeah.
 8  Q   Okay.  And that original pub -- proof of publication was filed
 9      with the court in this case, is that correct?
10  A   Correct.
11              MR. HALL: Move for the admission of 13.
12              THE COURT: Any objection?
13              MR. COSTANZO: No.
14              THE COURT: Thirteen is admitted.
15              (At 1:48 p.m., exhibit 13 is admitted)
16  BY MR. HALL:
17  Q   All right, following that, Mr. Pung -- Mr. Pung, I'm sorry.
18      Following that, Mr. Pickens, you filed an amended petition of
19      foreclosure with the court?
20  A   Yeah, it's not statutory, it's something we do as a
21      convenience for the court.
22  Q   And in fact there's a reason for that, correct?
23  A   Yes, because when we originally start we have a great number
24      of parcels that we forfeit and are foreclosed, and those I
25      have redeemed come off of our petition and --
```

14

**Page 15**

```
 1  Q   It could reduce the number of properties involved in the whole
 2      process when you filed the amended petition and identified
 3      just the ones that are still outstanding I presume?
 4  A   Right.
 5  Q   And that is a copy of the amended -- exhibit number 14 is a
 6      copy of the amended petition, is that your correct, that you
 7      filed with this court in this case?
 8              (At 1:49 p.m., exhibit number 14 identified)
 9  A   Yes.
10  Q   And in fact does it have attached some properties including
11      the property at issue in this lawsuit?
12  A   Yes.
13              MR. HALL: And in fact -- well I think you've
14      testified.  Okay, move for the admission of 14, Your Honor.
15              MR. COSTANZO: No objection, Your Honor.
16              THE COURT: Fourteen is admitted.
17              (At 1:49 p.m., exhibit 14 is admitted)
18  BY MR. HALL:
19  Q   Now following the amended petition in this particular case,
20      did there become a time when you had a actual hearing before
21      this court?
22  A   Yes.
23  Q   And you obtained a judgment of foreclosure, is that correct?
24  A   That is correct.
25              MR. HALL: Of course we would ask the court to take
```

15

**Page 16**

```
 1      judicial notice of its judgment of foreclosure in this case.
 2              THE COURT: An objection?
 3              MR. COSTANZO: Your Honor, if you in fact entered the
 4      judgment I have no objection.
 5              THE COURT: The court will take judicial notice.
 6  BY MR. HALL:
 7  Q   All right, then finally at some point in time (inaudible due
 8      to Mr. Hall not being near a microphone)... you mailed a letter
 9      out, is that correct, that's exhibit 15?
10              (At 1:50 p.m., exhibit 15 identified)
11  A   Yes.
12  Q   That letter was mailed to, in this case, the to -- what
13      address?
14  A   To 5475 Blue Herron address, Alma, Michigan.
15  Q   All right.  And there's some writing in the lower portion of
16      the letter below the typed portion, was that added by you at a
17      later time?
18  A   Sample of the original sent in April, is that what you're
19      talking about?
20  Q   Yes.
21  A   Yes.
22  Q   And you wrote that on there after it was sent?
23  A   Correct.
24  Q   Okay, and those are your initials below?
25  A   Yes.
```

16

**Page 17**

1    MR. HALL: Move for the admission of 15, Your Honor.

2    MR. COSTANZO: No objection.

3    THE COURT: Fifteen is admitted.

4    (At 1:51 p.m., exhibit 15 is admitted)

5 BY MR. HALL:

6 Q    So, Mr. Pickens, did you ever issue any denial of the personal

7    residence exemption on the Pung property?

8 A    No, that was done by the township.

9 Q    And do you have any authority to change this denial that had

10    been issued by Union Township in this case?

11 A    No, it's very clear in the statute, it's a tribunal asset

12    authority.

13 Q    You can't modify that --

14 A    No.

15 Q    -- you have no authority to?

16 A    Neither do they after they make the denial.

17 Q    So the process would be, in order to get the addresses for the

18    notices, as -- is it that you are provided with those

19    addresses by Union Township?

20 A    And we settle with each one of the townships, Union being one

21    of those townships.  Through the computer records we copy

22    their files onto ours and we settle -- we buy their

23    delinquents, yes.

24 Q    Okay when you do that -- so is it correct that the county

25    treasurer actually pays the township the delinquent tax

17

**Page 18**

1    amounts?

2 A    We purchase the delinquent taxes, yes.

3 Q    Is it dollar for dollar?

4 A    Yes.

5 Q    So if I didn't pay my taxes and it was in foreclosure and the

6    township brought it to you, you would pay whatever I didn't

7    pay to the township so they actually get their money?

8 A    That is correct.  The only caveat to that is summer tax, which

9    we now have summer taxes. There is a one percent interest

10    added on to which we pay as well with the base tax.

11 Q    To the township or the municipality, correct?

12 A    (Inaudible)… yes.

13 Q    Okay.  So they actually get their money and they're gone,

14    they're -- you're the one charged with the foreclosure process

15    then --

16 A    Yes.

17 Q    -- for those that don't come in and redeem the property,

18    correct?

19 A    There's a current tax to a late tax to a delinquent tax to a

20    forfeiture status to a foreclosure status.

21 Q    So when you receive this list, as I understand it, of

22    delinquent tax properties from the township as in this case,

23    it doesn't have with it any explanation of why the taxes were

24    a certain amount versus the amount that was paid or anything

25    like that, is that correct?

18

**Page 19**

1 A    They certified that this is what (inaudible due to speaking

2    low)… is still outstanding and we go from there.

3 Q    So they don't reference it --

4 A    We buy it --

5 Q    -- they don't --

6 A    -- we buy it as a base -- as base -- as base tax, as

7    delinquent taxes, yes.

8 Q    So you wouldn't know whether the fact that the taxes were

9    delinquent on a personal piece of property was a result of a

10    denial of a P-R-E or just nonpayment of the taxes in their

11    entirety when you get the piece of paperwork from the

12    township, correct?

13 A    Correct.

14 Q    Okay.  So then you go about your statutory duties as you've

15    indicated, which would be the 2012 tax foreclosure process,

16    with regard to all properties which remain delinquent

17    thereafter, correct?

18 A    Right.

19 Q    Now Mr. Pung has -- has suggested that under MCR211.78K(9)

20    that you had the authority or ability to, in this case, cancel

21    the foreclosure by recording with the register of deeds for

22    the county a certificate of error, do you understand it?  I'm

23    going to show you this.  (Inaudible due to not standing by

24    microphone)… copy of the statute.  And you were aware that

25    they had requested that you take a look at that statute,

19

**Page 20**

1    correct?

2 A    Only upon filing of a court case.

3 Q    Yes, but I mean since this has started you were made aware

4    that --

5 A    Right.

6 Q    -- they were suggesting that you could cancel the foreclosure

7    based upon that statute?

8 A    After the judgment is -- when the case was filed for this,

9    yes.

10 Q    After the judgment of foreclosure had been -- yes --

11 A    Right.

12 Q    --entered.  Okay, and you have reviewed that statute, is that

13    correct --

14 A    Correct.

15 Q    -- for that purpose?

16 A    Yep.

17    MR. HALL: What is your conclusion regarding your

18    ability to cancel the foreclosure in this particular case

19    based upon that statute?

20    MR. COSTANZO: Excuse me, Your Honor.  Mr. Pickens'

21    opinion, the court may hear it but it is a statute, it says

22    what it says.  It's up to the court to interpret that statute

23    --

24    MR. HALL: Totally agree.

25    MR. COSTANZO: -- not Mr. Pickens.  So this is

20

**Page 21**

```
 1   irrelevant to the decision in this case, but obviously if the
 2   court wants to hear it that's fine, but that's not a relevant
 3   question in this -- in this situation.
 4         MR. HALL: Well I think it's -- my -- my response is
 5   that it's relevant, it's not compelling, but it's relevant and
 6   it should at least an explanation of why he did or did not
 7   cancel it, and that's the purpose of the question.
 8         THE COURT: Well for the purpose of his state of mind
 9   I'll allow it.  So I'll overrule the objection to that extent.
10 BY MR. HALL:
11 Q   Understanding that you're not the court and can't interpret
12     that, but you read it over, is that correct?
13 A   Correct.
14 Q   And you -- your conclusion was what?
15 A   My conclusion was it's a certificate of error.  In the event
16     that we discover through our process here that we talked about
17     through our timeline that we have made a mistake of some sort,
18     not given a proper notice or not doing one of the statutory
19     requirements then we can file this without having to interpret
20     the courts for that, that's what this statute is for.  And in
21     this case there was no error, the taxes were legitimate and we
22     went forth with the procedure.
23 Q   Do you think you have any ability under the law at this state
24     of the proceedings now that the judgment of foreclosure has
25     been entered, the 21 days has passed and we are here
```
21

**Page 22**

```
 1   significantly later, is there any ability for you to do
 2   anything but continue as owner of the property based upon the
 3   judgment of foreclosure?
 4 A   I have no authority to change the judgment.
 5 Q   Is it your understanding that you follow the law with regard
 6   to the foreclosure of this property?
 7 A   Absolutely.
 8         MR. HALL: I have no further questions, Your Honor.
 9                   CROSS-EXAMINATION
10 BY MR. COSTANZO:
11 Q   Mr. Pickens, because of this case and what has transpired not
12     only with the 2012 taxes, but the '07, '08, '09 and the '10
13     and '11 taxes, you've known that Timothy Scott Pung has been
14     deceased for a long time, correct?
15 A   Yes.
16 Q   You and I, I think and you correct me if I'm wrong, but at the
17     very latest you knew I was representing Mike Pung, and Mike
18     Pung is the personal representative of the estate of Timothy
19     Scott Pung in 2012, maybe '11 at the outside, right?  We had
20     correspondence back and forth.
21 A   For a prior case, yes.
22 Q   And you knew that very soon after Judge Lasher's opinion, the
23     administrative law judge that decided the estate's appeal of
24     the 2007, '08 and '09 taxes, you had a copy of that within a
25     month or so of that opinion, didn't you?
```
22

**Page 23**

```
 1 A   Yes, and that was on a prior denial.
 2 A   Correct.  That -- and that was his March 7, 2012, opinion.
 3     You had that within a few weeks, maybe a month, the outside of
 4     when that opinion was drafted, right?
 5 A   Correct.
 6 Q   And that -- that opinion contained all the facts as far as
 7     when Timothy Scott Pung died, the fact that Mike Pung was
 8     personal representative, the fact that Mark Pung and Donna
 9     Marie Pung and Katie Pung were the heirs of Timothy Scott
10     Pung, right?
11 A   Yes.
12 Q   It also had his findings of fact that Donna Marie Pung had
13     resided in that house continuously as her principal resident
14     and then when she left Mark Pung had resided in that property
15     as his principal residence, correct?
16 A   Yeah, you're talking about a denial that was done by the
17     township.
18 Q   I'm talking about Judge Lasher's opinion of March 7, 2012.
19 A   Of that denial, yes.
20 Q   And then you and I had conversations, at least one
21     conversation over the phone in August of 2012, and I followed
22     up with a letter in August of 2012 too, correct?  That
23     had, among other things, my concerns about 2010 tax, 2011 tax
24     and the 2012 tax, right?
25 A   Correct.
```
23

**Page 24**

```
 1 Q   So first of all you've testified here under direct examination
 2     that in essence your hands were tied and you get this
 3     information from the township and then you're duty bound by as
 4     the treasurer to do what you have to do --
 5 A   Correct.
 6 Q   -- that's what I heard anyway?
 7 A   Yep.
 8 Q   So you had the administrative law judge's opinion, you knew
 9     what his findings of fact were, correct?
10 A   Of that former denial, correct.
11 Q   Yeah, you knew that he found that Mark Pung had continuously
12     resided in that property as his principal residence in not
13     only in 2007, '08 and '09, which were the years of the denial,
14     but also '10, '11 and into 2012, right?
15 A   (Inaudible)…
16 Q   You had that information?
17 A   I had it up to the date of the filing of the motion to what
18     Mr. Lasher had said, correct.
19 Q   Okay.  So you get something from the township I'm assuming
20     regarding the 2010 to 2011 taxes?
21 A   Yes.
22 Q   Right.  And your testimony is you were duty bound?
23 A   Correct.
24 Q   Even though you knew that the administrative law judges
25     already found that that property had been resided in as a
```
24

1   principal residence through 2010 and 2011?
2 A  I went through that process because due to our conversation
3   that we had I contacted the tribunal. The Michigan Tax
4   Tribunal told me that I was to do exactly what was on the
5   order and not to do anything different.  What was on the order
6   was seven, eight and nine, ten and 11 or 12 was excluded from
7   that --
8 Q  Okay.
9 A  -- I had direct orders.
10 Q  So then you -- we go before Judge Chamberlain and Judge
11   Chamberlain tells you; 2010 and 2011 are paid, the circuit
12   judge in Isabella County?
13 A  That's correct.
14 Q  And you still follow through?
15 A  I put an appeal in which is the rights (inaudible)… county
16   too, yes.
17 Q  Right.  So that Mr. Pung, knowing full well that the facts are
18   the facts and there's no way to change those.  In 2010 and '11
19   and into 2012, Mark Pung was still residing in that property
20   as his principal residence; you knew that to be true based on
21   the findings of facts of the A-L-J?
22 A  According to the statement of the --
23 Q  Right.
24 A  -- Judge Lasher, yes.
25 Q  So you follow through on this -- on this appeal of this

25

1   proceed.
2        THE WITNESS: Your question again?
3 BY MR. COSTANZO:
4 Q  You had the A-L-J's opinion, you knew that he found that Mark
5   Pung resided in that property, continued to reside at that
6   property into 2010.  That they were entitled -- the estate was
7   entitled to the exemption and yet you decide you're going to
8   follow through with the appeal of this judge's ruling about
9   the 2010 and '11 taxes initially, right?
10 A  At what point in time does it become a denial in my book?
11   When I, like the question before; when they come over they
12   come over as a tax, those are not even researched or anything
13   until we have the foreclosure process that we go.  So at the
14   timing of what it is, yes that's --
15 Q  Once -- but -- but once you take over and you said it as the
16   foreclosing governmental unit, that's in your hands, you're
17   the petitioner, right?
18 A  For the foreclosure for that --
19 Q  Absolutely --
20 A  -- (inaudible due to speaking over each other)…
21 Q  You're the one that brought the 2010 and '11 and then later
22   the 2012 issue before this judge, you did --
23 A  Correct.
24 Q  -- right?
25 A  Yes.

27

1   judge's decision regarding 2010 and '11, in the face of the
2   facts of termination of the administrative law judge?
3   Excuse me, one more time.
4        MR. COSTANZO: Yeah, you follow --
5        MR. HALL: I'm going -- let me --
6        MR. COSTANZO: -- through --
7        MR. HALL: -- make an objection to this because the
8   appeal wasn't taken solely on that issue.  There was a dispute
9   over the application of the tax tribunal rule to the 2010 and
10   2011 taxes, you know that.  That's my --
11        MR. COSTANZO: The question still stands, Your Honor,
12   the factual determination had been made by the administrative
13   law judge that that property had been occupied as a principal
14   residence through -- into 2012 and Mr. Pickens chose --
15        THE WITNESS: No --
16        MR. COSTANZO: Wait a minute now, hang on.  Mr.
17   Pickens chose to follow through with an appeal of your
18   decision in light of those facts.  Now he can answer it
19   however he wants to answer it, but that's a legitimate
20   question.  This case has been called, it's 2012 and '14, this
21   is extremely relevant to what's going on here and I think I'm
22   entitled to an answer.
23        MR. HALL: Actually I don't think it's relevant, but
24   --
25        THE COURT: I'll overrule the objection, you may

26

1 Q  You did that in the face of the administrative law judge's
2   opinion that into 2012, Mark Pung continued to reside in that
3   property as his principal residence --
4 A  The 2012 is not relevant to this -- to this tax year.
5 Q  You took our house because of the 2012 taxes, how is that not
6   relevant?
7 A  The taxes from the winter become actual tax through the board
8   of review and all that, this is a separate issue than that
9   whole case prior to.
10 Q  It's -- you're the person that decided to proceed once the
11   foreclosure --
12 A  By statute.
13 Q  -- was filed, right?
14 A  By statute, yes.
15 Q  No, not by statute, you decided to do it.
16 A  I proceeded on the opinion that was given for the '10 and '11
17   and the -- and that's it because I had no jurisdiction on the
18   '07, '08 and '09.
19 Q  You're the petitioner, you could have stopped the appeal on
20   the '10 and '11 taxes.  You could have stopped on the --
21 A  (Inaudible due to talking over each other)…
22 Q  -- foreclosure -- wait a minute, let me ask the question. You
23   could have stopped the appeal of this judge's ruling on the
24   '10 and '11 tax at any time after he made his ruling. You
25   could have said; that's it, we're done, we took our lumps, God

28

Page 29:

```
 1     bless the Pung estate, right, you decided?
 2  A  Yeah if you remember I come to this court and I told the
 3     courts that I had taken it off the petition and there was no
 4     chance for foreclosure on that 2010's property.  But the
 5     argument from you was you wanted your day in court.
 6  Q  Exactly.
 7  A  Okay, but I offered to take it off the petition -- off the
 8     petition.
 9  Q  Yeah that's magnanimous of you --
10  A  Well you're telling me that I have the rights to not foreclose
11     or foreclose, I'm telling you that I took necessary steps not
12     to foreclose on it so that you could get it fixed at the
13     tribunal to where you had your relief from before.
14  Q  You got it fixed --
15  A  Well --
16  Q  -- this judge fixed it and you decided to appeal it?
17  A  I appealed the decision, yes.
18  Q  And we go to the Court of Appeals and the Court of Appeals
19     said we were right and we -- the judge was right, we were
20     right, those taxes are paid, you have to give effect to that
21     tax tribunal ruling, right?
22  A  The subsequent rule that -- for the '10 and '11, correct, not
23     the '12.
24  Q  So we go to the Court of Appeals January 14, 2015, to argue
25     about the '10 and '11 taxes that you appealed?
```

29

Page 30:

```
 1  A  That I originally tried not to foreclose on, yes.
 2  Q  Why didn't you tell us anything when you were there January
 3     14, 2015, about the fact that you were getting ready to
 4     foreclose on the 2012 taxes?
 5  A  Well I think it was very obvious in the court case that we had
 6     back in February prior, that you attended to which you gave
 7     this argument on '10 and '11, that you even said in your own
 8     words and it's in the documents of this court.  You said; I
 9     don't think you can do anything with '12.  The judge, when he
10     made his ruling, says; you understand I'm not making any --
11     I'm not effecting the '12.  You knew the '12 was there, it was
12     way back then, why would I have to comment to you on January
13     when I'm sending notices on '12 all the way through.
14  Q  You don't think you have to comment to me?
15  A  I -- well -- well I'm sending notices and that's why my
16     statutory duty is.
17  Q  You're going -- you're going to appeal the '10 and '11 taxes
18     causing my client to spend I don't know how many thousands of
19     dollars in order to do it.  And then while he's appealing the
20     '10 and '11 taxes, you are running the '12 taxes through in
21     the face of the A-L-J's opinion and you don't have to tell me
22     about it?
23  A  Because I -- I'm telling you -- I'm telling (inaudible)… about
24     it right through my notices.  I'm -- I'm -- I'm covering my
25     statutory duties.  I can't individually take everybody that's
```

30

Page 31:

```
 1     on my forfeiture list and make a phone call and try to do
 2     that, no --
 3  Q  You could --
 4  A  -- (Inaudible due to speaking over each other) --
 5  Q  -- if you --
 6  A  -- well I could --
 7  Q  -- if you see them in person?
 8  A  -- but it would be structurally impossible.
 9  Q  But if you saw them in person at the Court of Appeals and they
10     were arguing about the same property you could have, couldn't
11     you?
12  A  Well it's neither here nor there, it's -- I do my statutory
13     duties, they've been fulfilled and those are the notices that
14     I sent.
15  Q  Could you have asked Mr. Hall; hey, you know Mr. Pung is
16     represented, you know the guy has fought every inch of this
17     thing, why don't you get ahold of his attorney, give him
18     notice?
19  A  Why didn't --
20  Q  Did you do that?
21  A  Well why didn't you say; okay, Steve, I think it was off the
22     petition that's okay we'll seek refuge at the tribunal before.
23     I made every attempt not to foreclose on the first one.
24  Q  Your question might have --
25  A  Your question to me on whether I was supposed to give you
```

31

Page 32:

```
 1     additional notices --
 2  Q  Your question might have been relevant if we hadn't have won
 3     in the Court of Appeals, we were right.  You chose the forum,
 4     we got out day in court and we won, right?
 5  A  That's the way the court ruled on '10s and '11s.
 6           MR. COSTANZO: I want to -- I want to look at these
 7     notices, because I did see -- I'm going to try and get them in
 8     order.  I start with six; do we have one through five?
 9           MR. HALL: The court has them.
10           MR. COSTANZO: Mr. Pickens, I think we've already --
11     Your Honor, can I approach but just to hand him the exhibits?
12           THE COURT: (No verbal response)
13  BY MR. COSTANZO:
14  Q  I just want to go through these with you.  Do you agree with
15     me that the majority of these notices are made out to --
16     addressed to Timothy Scott Pung, right?
17  A  The address that was on the tax roll, correct.
18  Q  I'm not talking about the address because I'm not going to
19     deny that some of those may have been mailed to Blue Herron.
20     I'm asking you the actual person who it was addressed to was
21     Timothy Scott Pung?
22  A  As it's listed on the tax roll, yes.
23  Q  Answer the question.
24  A  Yes, as it's listed on the tax roll.
25  Q  Your job is to notify the individual who can do something
```

32

1    about it to the extent that you can about this process?
2 A   Some of the not -- some of the notices --
3 Q   Would you please answer the question?
4 A   I've answered your question.
5 Q   No you're not.
6 A   Yes I am --
7 Q   It's a yes or no question.
8 A   No it's not.  It's not a yes or no question.  Some of the
9    notices, per the requirements of the statute, say that we are
10    to list the notices to the people of record, okay.  And if the
11    person of record is dead we still have to list that person and
12    send them notice and we do.  Some of the records -- some of
13    the notices say that we have to give notice to interested
14    parties, that's why we do title work and we do all that.  We
15    find all the interested parties and we send them notice.
16 Q   So you did the title work, which you already told us you knew
17    that I was representing Mike Pung, you knew Mike Pung was
18    representing the estate as personal representative back in '10
19    and '11.  These notices that went out to Timothy Scott Pung
20    should have gone out -- the ones that are supposed to go out
21    to the interested parties should have gone out to Michael W.
22    Pung.
23 A   They went to the valid address where Michael Pung is.
24 Q   Addressed to Timothy Scott Pung.
25 A   Well if you notice on the one, the one notice that we sent

33

1    certified --
2 A   On the one --
3 Q   -- before the foreclosure, number four I believe it is we sent
4    one to Timothy Scott Pung certified and to Michael Pung,
5    personal representative, to which we had the card signed by
6    his wife --
7 Q   You --
8 A   -- of the Blue Herron address --
9 Q   You would not --
10 A   (inaudible due to speaking over each other)… of record.
11 Q   You would not dispute the fact that Mr. Pung timely paid all
12    of the taxes owing on this property if the P-R-E applied for
13    the years at issue?
14 A   I can state to the fact that there's some amount of taxes
15    turned over delinquent, yes.
16 Q   So you're -- essentially what you're doing with these notices
17    is telling an individual they may lose their house if they
18    don't pay whatever the tax is owing, right?
19 A   Correct.
20 Q   And one of the reasons that you do the title search is so that
21    you know who to send this stuff to, especially the interested
22    parties?
23 A   Correct.
24 Q   But you already knew who the interested parties were, you knew
25    Mike Pung was the personal representative and you knew I

34

1    represented him.  These notices went out to Timothy Scott
2    Pung, they didn't go out to Mike and they didn't go out to me,
3    correct?
4 A   They didn't go out to you, but they went to the address that
5    was listed, yes where Mr. Pung is personal representative.
6 Q   And then after this whole thing is over, as I understand it
7    when the foreclosure happens in February there is a redemption
8    period that runs through March I believe, correct, that's the
9    last shot to pay the tax, right?
10 A   The judicial hearing is in February and the uncontested parcel
11    is March 31st, correct.
12 Q   Okay.  So tell me this; this letter, the last one that you
13    sent, this is your exhibit, I think it's one of your last
14    exhibits; I'll show it to you.
15 A   I'm familiar with it.
16 Q   Okay, this letter went out to Timothy Pung, right?
17 A   Yep.
18 Q   That letter went to Timothy Pung, who has been dead since 2000
19    --
20 A   Yep.
21 Q   Okay --
22 A   Because that's the address on the tax roll.
23 Q   I'm not talking about the address, I'm talking about the
24    person whose name is on it, right?
25 A   Yep, because that's the name that's on the tax roll.

35

1 Q   And you waited until after the redemption period was up to
2    send the letter.
3 A   It's an unstatutory letter and we do it -- yes we send it out.
4 Q   If you're going to do it out of the goodness of your heart,
5    it's not a statutory requirement, why don't you do it when
6    they still have a shot to repay the tax?
7 A   I sent you geez how many notices here that's on the timeline
8    that says --
9 Q   Hey --
10 A   -- exactly the same thing.
11 Q   -- Mr. Pickens, you already told me; you didn't send me
12    anything.
13 A   Well that's you; I sent it to the person of interest.
14 Q   Yeah, you sent it to Timothy Scott Pung.
15 A   I sent it the address of the representative, that is the one
16    that's listed on the tax roll.
17 Q   And then -- I'm going to show you this because I'm going to
18    submit the report, this is the envelope that this letter came
19    in.
20 A   Okay.
21 Q   And you see it went through Grand Rapids on the 22nd of April.
22 A   Yep.
23 Q   It's dated April 2nd --
24 A   Yep.
25 Q   Can you explain why you didn't mail it until the 22nd or 21st of

36

1   April?

2 A  It wasn't the only letter we sent out, it was -- it goes

3   through the Grand Rapids because that's where the county sends

4   all their mail.

5 Q  So by the time you even dated this letter there was no chance

6   according to you for any type of redemption on this property?

7 A  Then he'd need to send a letter, yes because the notices

8   before that said; you have until that phase, not one notice,

9   not two notices, but several notices.

10 Q  We talked about those.  I'm going to show you your exhibit 12,

11   this is the show cause hearing --

12 A  Okay.

13 Q  -- and there's -- there's a note here that says; agreements

14   were made with the following people, you got a list of people.

15 A  That is correct.

16 Q  Now those folks would have come to you, to that show cause

17   hearing?

18 A  That's right.

19 Q  And then you would have made agreements with them to settle

20   their debt in some fashion?

21 A  No.

22 Q  What would that --

23 A  I'll settle their debt, we -- we offer an extension of time to

24   some.

25 Q  So you have -- you have the ability to negotiation with these

37

1   people?

2 A  At the show cause hearing, yes.  That's what those notices

3   that we send out tell you.

4 Q  Now are you telling this court that you're reading of this

5   statute that allows you or I think mandates you to file with

6   the register of deeds, a cancellation of foreclosure only

7   allows you to do that if you've made an error?

8 A  Yes I believe so.

9 Q  So if you know for whatever reason that the taxes were paid

10   that should have been paid were paid, are you telling me that

11   if you didn't make an error you can't settle with the -- you

12   can't -- you can't declare that that foreclosure cancelled?

13 A  Not me personally, but an error in the process.  Because I

14   think one of the statements is in there is; were the taxes

15   paid, because that's one of the requirements resulting in an

16   error.

17 Q  Mr. Pickens, did you stop and think about the cost that this

18   procedure has -- has -- the cost this has caused this estate

19   to pay, the monetary cost of this?

20 A  I fully understand the cost because the tax payers of Isabella

21   County have paid the same thing probably.  I'm not sure what

22   your rates are, but I know what I've paid.

23 Q  Have you ever had your principal residence exemption denied?

24 A  No, because I filed it correctly.

25 Q  Do you know the administrative law judge indicated that the

38

1   estate had done what they needed to do in order to get it as

2   well, right?

3 A  What's that?

4 Q  The administrative law judge had ruled that the estate had

5   done what they needed to do to get the P-R-E as well.

6 A  The judgment was that the property received it, correct.

7         MR. COSTANZO: I have nothing further.

8         THE COURT: Any redirect, Mr. Hall?

9         MR. HALL: I'm just returning the exhibits back in.

10   No, no redirect, Your Honor.

11         THE COURT: You may step down.

12         THE WITNESS: Thank you.

13         MR. HALL: I'd call Patricia DePriest.

14         THE COURT: If you'll just stand there and raise your

15   right hand, the clerk will swear you.

16         THE CLERK/RECORDER: Do you solemnly swear or affirm

17   that the testimony you're about to give in this matter is the

18   truth, the whole truth and nothing but the truth?

19         MS. DEPRIEST:  I do.

20         PATRICIA DEPRIEST

21     (At 2:19 p.m., sworn as a witness, testified as follows)

22         DIRECT EXAMINATION

23 BY MR. HALL:

24 Q  Ms. DePriest, would you please state your name?

25 A  Patricia Marie DePriest.

39

1 Q  And are you currently employed?

2 A  Yes I am, sir.

3 Q  And where are employed?

4 A  Charter Township of Union.

5 Q  And what is your position with the Charter Township of Union?

6 A  I'm their assessor.

7 Q  And in that capacity, have you been employed as an assessor

8   for a period of time?

9 A  I've been there for almost 11 years.

10 Q  Okay, are you familiar with the townships board of review?

11 A  Yes.

12 Q  And as the assessor do you attend those board of review

13   meetings?

14 A  Yes I do.

15 Q  For the 2012 tax roll was in fact -- did the board of review

16   meet in 2013 for the purpose of settling the assessment roll?

17 A  Yes we did.

18 Q  Can you explain to the court how the assessment roll gets

19   settled, established finally for purposes of the tax records

20   for Union Township through the board of review?

21 A  I'm required by law to turn the roll over to the board of

22   review the Tuesday after the first Monday of the March every

23   year.  And at that point I give them the (inaudible)… and the

24   roll that they have then for the March (inaudible)… at that

25   point they settle (inaudible)…

40

1   Q   Did they eventually set the final roll --
2   A   (Inaudible, witness not speaking loudly)…
3   Q   -- is that correct?  Now in the course of their duties does
4       the board of review then have open public hearings where tax
5       payers can come in and present issues with regard to dispute
6       of their taxes either an assessment amount or P-R-E's and
7       things of that nature?
8   A   Yes.
9   Q   And those hearings by the board of review in 2012, do you
10      remember when they were conducted?
11  A   Yes, our organization meeting was March the 6th at 6:30; we
12      adjourned at 8:00.  March the 12th, which is the first Monday
13      that we meet by law and we were in session from 1:00 until
14      4:30 and again from 6:00 until 9:00.  March 14th we called the
15      order at 9:00 a.m. and we recessed at 11:30 for lunch, we
16      reconvened at 1:00 and adjourned at 4:30.  We met again March
17      15th from 1:00 until 4:30, reconvened at 6:00 until 9:30.
18      March 27th we called the order at 6:00 and adjourned at 9:30.
19      March 29th we were called to order at 6:00 and adjourned at
20      9:00, and March 30th we called the order at 3:00 and adjourned
21      at 4:30, and that was the final board of review which we
22      adjourned at 4:30.
23  Q   I -- on that last date, was that the date that the assessment
24      roll was established, do you know, the last date, March 30th?
25  A   That was the last date, yes.

41

1           MR. HALL: I have no further questions, Your Honor.
2           THE COURT: Cross-examination?
3           MR. COSTANZO: Thank you.
4                   CROSS-EXAMINATION
5   BY MR. COSTANZO:
6   Q   Ms. DePriest, your testimony was, as I heard it; you're
7       statutorily bound to turn the tax roll, the assessment roll to
8       the board of review the first Tuesday after the first Monday
9       in March?
10  A   That is correct.
11  Q   By stat -- by law?
12  A   By law.
13  Q   And you did that?
14  A   I did.
15  Q   And you say you did it on March 6th --
16  A   (Inaudible due to witness not speaking loudly)…
17          MR. COSTANZO: Of 2012?  My -- I don't have a
18      calendar with me, but I thought that the first Tuesday after
19      the first Monday was March 5th, but in any event that's when
20      you did your statutory duty, you did it on March 6th, right?
21      Is that right?
22          MR. HALL: I missed the question, Your Honor.
23  BY MR. COSTANZO:
24  Q   In other words, she turned over the tax roll to the board of
25      review, they received it on March 6th, 2012, right that's what

42

1       you said?
2   A   I can't (inaudible)…
3   Q   Excuse me?
4   A   That was what was typed, you're asking for the March 12th board
5       of review, am I correct?
6   Q   No, I'm asking; March 6th is when you turned over the roll to
7       the board of review, the assessment roll on March 6th?
8           THE COURT: What year?
9           MR. COSTANZO: Two thousand twelve.
10          MR. HALL: Thirteen, counsel.
11          THE WITNESS: I believe that this should say March
12      13th, because the 12th --
13          MR. COSTANZO: I'm going to
14          THE WITNESS: I denied 2012.
15  BY MR. COSTANZO:
16  Q   Yeah, so it should be March 6, 2013?
17  A   Thirteen, yeah, those are (inaudible due to witness not
18      speaking loudly)…
19  Q   Okay.  So on March 6, 2013 --
20  A   Yes, sir.
21  Q   -- you gave the roll to the board of review, that's your
22      statutory duty?
23  A   That is my duty.
24  Q   All right.  And it's the duty of the board of review to
25      receive that tax roll that first Tuesday after the first

43

1       Monday?
2   A   It's (inaudible)… go through before the board even starts on
3       the second Monday.
4   Q   And then after that there are days set aside, and it looks
5       like there were some dates set aside for appeals, so a citizen
6       could come in and appeal the tax assessment?
7   A   Yes they do.
8           MR. COSTANZO: Ms. DePriest, I -- you're the
9       individual that initially denied the principal residence
10      exemption --
11          MR. HALL: Objection, not within the scope of direct
12      exam.
13          MR. COSTANZO: I don't think it makes any difference
14      between the scope of direct exam, it's a relevant question,
15      Your Honor.  You can't limit my examination of a witness by
16      not asking her a question.
17          THE COURT: Well you --
18          MR. HALL: We're opening a whole new door here, Your
19      Honor, and it seems to me that I only called her for the
20      purpose of establishing when the board of review processed,
21      when it was evolved and what -- when the roll was --
22      assessment roll was established and that process.  I did not
23      get into anything about the denial.
24          THE COURT: Well technically that's correct, Mr.
25      Costanzo could recall her in his case --

44

1     MR. COSTANZO: Your Honor --

2       THE COURT: -- but for the sake of expediency if

3 you'll conduct this as a direct examination, the rules of

4 direct examination, I'll permit it for judicial economy.  You

5 may proceed.

6 BY MR. COSTANZO:

7 Q Thank you.  You're the individual from Union Township that

8   denied the principal resident exemption for this estate

9   property for the years 2007, 2008 and 2009, right?

10 A Yes I did.

11 Q Why did you do that?

12 A Because they -- the person on the homestead was deceased.

13     MR. COSTANZO: You do that as a matter of course?

14     THE COURT: Mr. Costanzo, when you stand --

15     MR. COSTANZO: I'm sorry --

16     THE COURT: -- there, you're in a dead spot --

17     MR. COSTANZO: -- I'm sorry, I apologize --

18     THE COURT: -- on the mic's.

19     MR. COSTANZO: -- I'm sorry, you're right, Your

20 Honor, I apologize.

21     THE COURT: Thank you.

22 BY MR. COSTANZO:

23 Q Do you do that as a matter of course?  In other words; when

24   you find out an individual has passed away you automatically

25   deny subsequent years?

---

1 A If they're the only person on the deed and the P-R-E, yes we

2   do.

3 Q Then you appeared at the administrative law judge hearing in

4   February of 2012, right, you went to that hearing?  I was

5   there, Mr. Pung was there, right?

6 A Yes I was there.

7 Q You got a copy of the administrative law judge's decision?

8 A Yes we did.

9 Q And that decision said that the heirs of Timothy Scott Pung

10   had been continuously residing in that property through the

11   date of the hearing, that's right?

12 A That's what it says, yes.

13 Q And that hearing was in 2012, the opinion came out March 7,

14   2012, right?

15 A I don't remember the exact date, sir, (inaudible)…

16     MR. COSTANZO: Let me show it to you.  May I

17 approach, Your Honor?

18     THE COURT: You may.

19 BY MR. COSTANZO:

20 Q Ms. DePriest, is that a copy of the A-L-J's opinion dated

21 March 7th --

22 A (Inaudible due to witness not speaking loudly)…

23 Q -- 2012, right?

24 A Yep.

25 Q And the administrative law judge found that the heirs of

---

1   Timothy Scott Pung had been continuously residing at that

2   property through then, correct?

3 A That's what he stated, sir.

4 Q So you had that opinion, but yet you denied the principal

5   residency exemption in 2010 and 2011, didn't you?

6 A The law states, sir, that the estate is eligible for it, but

7   someone has to come forward and claim it, and I had no one

8   come forward to claim that.

9 Q Well you tried that argument in front of the administrative

10   law judge and he refuted it, didn't he?  Didn't he?

11 A I don't remember, sir.

12 Q Well if -- if that argument would have carried the day, the

13   principal residency exemption would have never been entered or

14   ordered in this case, right?

15 A I don't have any idea, sir.

16 Q So at least as of 2010, you knew that the estate hadn't

17   applied, but you also knew that the administrative judge had

18   said they didn't have to, that they got the principal resident

19   exemption, correct?

20 A That's what they said, sir.

21 Q Right.  And you knew that the administrative law judge had

22   said that through that opinion somebody was still living in

23   that house as a principal residence, right?

24 A I don't know, sir, if they were or weren't.

25 Q The administrative law judge, from the tax --

---

1 A (Inaudible due to speaking over each other)…

2 Q -- tribunal said they were?

3 A -- or weren't, sir.

4 Q The opinion from the administrative law judge said they were,

5   correct?

6 A Yes, sir, they did.

7 Q And you didn't appeal that decision, did you?

8 A No I didn't.

9 Q So that appeal -- that decision became fine, right?

10 A Obviously.

11 Q It became the law in this case, right?

12 A In that case.

13 Q Yeah, so you tell the court why --

14 A I don't believe it's this case though now, sir.

15 Q Why did you deny 2010 and 2011 --

16 A Because of (inaudible to due speaking over each other)… --

17 Q -- in the face of that --

18 A -- sir, and that's what the law states.

19 Q So you don't care what the administrative law judge said, you

20   were going to tell them what the law was and apply -- and --

21   and deny the 2010 and '11 taxes, is that right?

22 A Yes I did, sir.

23 Q Then you denied the 2012 -- well no, let me ask you this;

24   initially when you sent out the notice for 2012, you granted

25   the principal residence exemption, didn't you?

```
 1  A    Yes I did.
 2  Q    And that would have gone out I believe in December of 2012?
 3  A    Yes it did.  I in turn, sir, was told by Peter Kopke that I
 4       had no right to give that homestead and I had to deny it,
 5       which in order of the tribunal I did.
 6  Q    Is there an order of the tribunal anywhere or was this based
 7       on a telephone conversation with somebody?
 8  A    With Peter Kopke because I had no documentation from anybody
 9       and I did not have the right to give that homestead was the
10       words.
11  Q    You had been told by the administrative law judge that the
12       estate was entitled to the principal residence exemption.
13  A    And it is, you have to have someone come forward for in the
14       law (sic) to get it.
15  Q    That's not what the administrative law judge --
16  A    I don't care what he says; the law says that you do.
17  Q    So you don't care what the A-L-J said, you can ignore what he
18       said, that's what you're saying?
19  A    (Inaudible)_ authority.
20           MR. HALL: I'm going to object, Your Honor, because
21       this is a different year.  That ruling of the tax -- tax
22       tribunal applied to the taxes through 2009, it didn't apply to
23       '10, '11 or '12 --
24           THE WITNESS: No one appealed that --
25           THE COURT: Just a -- just a --
```

49

```
 1           THE WITNESS: -- tribunal --
 2           THE COURT: -- a moment.
 3           MR. COSTANZO: Your Honor, the Court of Appeals
 4       already said --
 5           THE COURT: Mr. Hall?
 6           MR. COSTANZO: -- despite what they keep trying to
 7       say that the subsequent years apply.  That's already -- that's
 8       the law of this case as well.  But I think I'm entitled to
 9       know why she took it upon herself to continue this in the face
10       of the administrative law judge's opinion that has forced my
11       client to expend money with me then he saved in the --
12       with the P-R-E.  I think that's a relevant question.  I think
13       I'm entitled to know and I think she's answered it.  Basically
14       this Kopke, whoever he is, his telephone conversation trumps
15       the administrative law judge's decision, that's what she says.
16           THE COURT: Mr. Hall --
17           MR. HALL: Yes?
18           THE COURT: -- did you have something; you were
19       interrupted in your statement?
20           MR. HALL: I just was saying that I objected to his
21       pursuit of the question with the witness about her being bound
22       by this tax tribunal decision for years other than what were
23       covered by the tax tribunal decision.  Now, the witness hasn't
24       been qualified as an attorney or even somebody who is
25       qualified to make a judgment on the ruling of the tax tribunal
```

50

```
 1       or, you know, make a determination of the effect of that, but
 2       we've argued that --
 3           THE COURT: Well this is really the crux of the case.
 4           MR. HALL: It is.
 5           THE COURT: Right.  So let's get the facts out --
 6           MR. HALL:  But I'm not sure, Your Honor, -- may I --
 7       may I?
 8           THE COURT: You may when I'm done, Mr. Hall.  Let's
 9       get the facts out and then you can argue the legal arguments
10       of what the A-L-R judge said, what's the scope of his ruling
11       and whether or not it's res judicata.  After all, that's what
12       this case is about.  So let's see who did what and why, with
13       what knowledge and then let's apply the law to it.
14           MR. HALL: But are -- okay.  May I now?
15           THE COURT: You may.
16           MR. HALL: My position is, and it doesn't matter why
17       she denied it, has nothing to do with it because the denial
18       was in fact in place. The taxes came to the treasurer and the
19       treasurer is the party to this lawsuit and the treasurer is
20       the person who has to explain what it is, why he did what he
21       did, and which is what we're doing.  So really this denial
22       thing -- I understand that he'd like to know and I think she's
23       explained to him cause his client didn't file an application
24       for 2012, or his client's residence, I think she's explained
25       that.  But nonetheless, I don't see how that's relevant to the
```

51

```
 1       actual matter before the court.
 2           THE COURT: Well it -- it -- you know I don't -- I'm
 3       not on that side of the bench preparing these cases or
 4       presenting them.  I don't know what -- what Mr. Costanzo is
 5       going to do as far as showing factually or arguing legally to
 6       the court what knowledge the country treasurer had, what
 7       knowledge the assessor had, what knowledge the -- the next
 8       witness had or any witness he may have.  If they went forward
 9       with the knowledge that there's the ruling of the A-L-R that
10       they don't like it, that they're going to ignore it then --
11       then there is error here that could potentially have an impact
12       on the case.
13           MR. HALL: I would just say, Your Honor --
14           THE COURT: I'm not -- I'm not -- this evidence is
15       relevant because it may lead to other evidence that's
16       admissible and relevant and I'm going to permit it, so the
17       objection is overruled.
18           MR. HALL: I would like to object again on the basis
19       that this court doesn't have jurisdiction to alter the
20       judgment of foreclosure except for the purpose of determining
21       whether or not notice has been given, has nothing -- all this
22       fact finding has to -- is within the exclusive jurisdiction of
23       the tax tribunal.  That's all I'm -- that's my objection, Your
24       Honor.
25           MR. COSTANZO: In response, Your Honor, they tried
```

52

**Page 53**

```
 1   that before, that was the objection that they made in 2013
 2   when you made your ruling and that's part of this issue that I
 3   -- I'm talking about.  They're still standing up and arguing
 4   about the effect of the tax tribunal rule when the Court of
 5   Appeals has ruled unanimously that the tax tribunal rule
 6   applies to succeeding years. There's no question about that
 7   anymore, that's been decided by the Court of Appeals in a
 8   three to nothing decision.  Not only because of the tax
 9   tribunal rule, but also because of the stature, that's done,
10   and so is this question about you having jurisdiction because
11   this is a foreclosure action.  And there's other reasons why
12   you can hear it, one of them has to do with the reason that
13   Mr. Pickens has the right, and I think the duty, to set these
14   aside if he knows the tax has been paid, that question is
15   still relevant here.
16        But even now I'm hearing from them that this tax
17   tribunal decision by the A-L-J doesn't apply beyond '09,
18   that's done, that's over --
19        MR. HALL: No, we're saying --
20        MR. COSTANZO: -- they lost that.
21        MR. HALL: -- it doesn't apply towards -- after 2011
22   because it's clear that the Court of Appeals rule that it
23   applied through 2011.  We're saying it doesn't apply past 2011
24   taxes, not --
25        THE COURT: Well and that, you know, once again we're
```

**Page 54**

```
 1   back to where we started, that's the crux of the case.  Let's
 2   see what the facts bear.
 3        MR. HALL: May I read something to the court from a
 4   case?  This is different because we already have a judgment of
 5   foreclosure, that's different than what we had before when
 6   counsel came in in the process of the foreclosure and asked
 7   for relief and then we got into fact finding.  The Petition,
 8   In Re Petition by Treasurer of Wayne County for
 9   Foreclosure, 478 Mich 1 says; if a property owner does not
10   redeem the property or appeal the judgment of foreclosure
11   within 21 days then MCL211.78(K)(6) deprives a circuit court
12   of jurisdiction to alter the judgment of foreclosure,
13   MCL211.78(K)(6) thus absolute title in the foreclosing
14   governmental unit and if the taxpayer does not redeem the
15   property or avail itself of the appeal process in subjection
16   seven, then title shall not be stayed or held invalid.  That's
17   the law.  So that's different than what we were doing before.
18        MR. COSTANZO: If that's the case that Mr. Hall was
19   quoting from in his brief, I think he was reading from a
20   decent, and that one provision of that statute was declared
21   unconstitutional by the Michigan Supreme Court for probability
22   reasons similar to what -- what we're looking at here.  But I
23   -- I only have a couple more questions here, I'm --
24        THE COURT: Well here, you know, here's the bottom
25   line; I've allowed some latitude with -- with legal arguments
```

**Page 55**

```
 1   in order to define, assist the court in defining what's
 2   relevant from a factual basis at an evidentiary hearing, which
 3   I'm currently conducting.  But the -- these arguments are
 4   proper after the close of the proofs and during your -- your
 5   closing arguments, counsel.  And I'm happy to look at them,
 6   but they have some impact on the evidentiary ruling of the
 7   court.  So as I've stated I allowed it, but let's -- let's
 8   save it for your closing.  Let's get the facts out, let's
 9   argue the facts and the law at closing and I'll make a better
10   decision hearing these closing arguments and the leg -- the
11   rest of the legal arguments at that time, including revisiting
12   these arguments.
13        But for the sake of making an evidentiary ruling I
14   have to understand what the legal arguments are and that's all
15   I -- all I intended to permit.  I've made the ruling, so we
16   can -- in fact I -- I would request counsel to readdress these
17   legal issues in the context of the full case with the facts,
18   argue the facts, argue the law and give me clear closing
19   arguments on your positions.  That's good advocacy.  I think
20   counsel didn't need my instruction to do that, you're both
21   fine attorneys, you've both practiced with me when I was in
22   practice 23 years ago and in front of me in the 23 years I've
23   been on this bench and I have a lot of respect for both of
24   your abilities.  I'm not trying to tell you how to do your
25   cases, but I also want good, solid closing arguments and I'm
```

**Page 56**

```
 1   admonishing you to make sure you make those legal arguments in
 2   light of the factual development of this case.  You may
 3   proceed.
 4        MR. COSTANZO: Thank you, Your Honor.
 5   BY MR. COSTANZO:
 6   Q   Ms. DePriest, I just want to get this right; so the reason
 7       that you denied the principal residence exemption after the
 8       administrative law judge's opinion is because somebody from
 9       the tribunal called you up and told you that there was no
10       application filed and you need an application, is that right?
11   A   That is (inaudible)… she is the chief clerk of the tribunal,
12       and no one appealed it to the tribunal in the 35 day period.
13   Q   You ignored the tax tribunal ruling once in this case, didn't
14       you?
15   A   No I didn't, sir.
16        MR. COSTANZO: That's all I have, Your Honor.
17        THE COURT: Mr. Hall, anything further?
18        MR. HALL: No, Your Honor.
19        THE COURT: You may step down. I assume you have
20   another witness, Mr. Hall?
21        MR. HALL: One short witness, yes.  Call Elaine
22   Andres.
23        THE COURT: Okay, just a moment.  All right, your
24   next witness, Mr. Hall?
25        MR. HALL: Yes, we'll call Elaine Andres.
```

THE CLERK/RECORDER: Do you solemnly swear of affirm that the testimony you're about to give in this matter is the truth, the whole truth and nothing but the truth, so help your God?

MS. ANDRES:  Yes.

ELAINE ANDRES

(At 2:53 p.m., sworn as a witness, testified as follows)

DIRECT EXAMIANTION

MR. HALL: Preliminarily this witness is being called for the purpose of establishing that exhibits one, two, three and four were mailed by her as an employee of the -- because there's some objection, of the treasurer's office, there's some objection to that at some point in these proceedings.

So, Ms. Andres, would you please state your name?

THE WITNESS: Elaine Andres.

BY MR. HALL:

Q    And are you currently employed?

A    Yes.

Q    Where are you employed?

Q    And where what?

Q    Where are you employed?

A    Isabella County Treasurer's office.

Q    And how long have you been there?

A    Twenty-four years.

Q    And in that capacity have you been involved in the tax

57

forfeiture and foreclosure process?

A    Yes.

Q    And how many years have you worked in that area?

A    Exactly just doing that as a tax inversion administrator, I've been sending out the notices since 1997.

Q    Nineteen ninety-seven.  Okay, so you're familiar with the procedures, correct?

A    Oh yes.

Q    And your duties involve mailing the notices to tax delinquent property owners --

A    Yes.

Q    -- in Isabella County?

A    Yes.

Q    I'm going to show you what has been previously admitted in this case as exhibit number one.  And on the very upper left side there's ink written there, I believe it says; first notice sent.

A    Yes.

Q    Is that your signature or is that your writing, handwriting?

A    Yes.

Q    And did you in fact mail the notice represented by this exhibit one to the address shown on the second page?

A    Yes.

Q    In this case it's highlighted Timothy S. Pung, 5475 Blue Herron, Alma, Michigan 48801?

58

A    Yes.

Q    And in fact exhibit number two, that also has some writing at the left side on the first page, is that your writing?

A    Yes.

Q    And your capacity as an employee of the treasurer's office, did you mail this notice out in the course of the 2012 tax forfeiture and foreclosure proceedings?

A    Yes.

Q    And in that regard, you also mailed that to the address shown and highlight in yellow on the third page of that exhibit?

A    Yes.

Q    I'll show you what's been admitted as exhibit number three and ask again if you wrote the handwritten wording in ink on the upper left hand corner of the first page?

A    Yes.

Q    Indicating that that notice was sent certified?

A    Yes.

Q    So you mailed it certified, is that correct?

A    Yes.

Q    And was it mailed certified to the address highlighted in yellow on the second full page?

A    Yes.

Q    And exhibit number four, you in fact wrote the handwriting on the upper left of that one as well?

A    Yes.

59

Q    And on that one did you in fact mail that notice also to the address shown -- actually it's on the -- both the Pung, Michael, W. 5475 Blue Herron Drive, Alma?

A    Yes.

Q    And Timothy S. Pung at 5475 Blue Herron Drive, Alma?

A    Yes.

Q    You did all these things in the course of your duty as -- as an employee of the treasurer's office?

A    Yes.

MR. HALL: No further questions, Your Honor.

THE COURT: Cross-examination?

MR. COSTANZO: Just one minute, Your Honor, I don't know if I have a question or not.  I have no questions, Your Honor.

MR. HALL: I have no -- obviously I have no other questions for this witness.

THE COURT: You may step down.  Do you have any other witnesses, Mr. Hall?

MR. HALL: I'd like to call Mike Pung to the stand, please.

THE CLERK/RECORDER: Do you solemnly swear or affirm the testimony you're about to give in this matter will be the truth, the whole truth and nothing but the truth, so help your God?

MR. PUNG: I do.

60

MICHAEL PUNG

(At 2:58 p.m., sworn as a witness, testified as follows)

DIRECT EXAMINATION

BY MR. HALL:

Q    Mr. Pung, state your name, sir.

A    Michael W. Pung.

Q    Are you the personal representative of the estate of Timothy Scott Pung, decedent?

A    I am.

Q    I'm going to show you what's been marked as exhibit number 16 and ask you if you've seen that document?

A    Yes.

Q    Is that a copy of a letter that you sent to the Michigan Tax Tribunal?

A    It is.

(At 2:58 p.m., exhibit 16 identified)

Q    And was it sent, as far as you know, on or about the date specified on the front page of the letter?

A    The 27th of March, 2013.

MR. HALL: Move for the admission of exhibit 16.

MR. COSTANZO: No objection.

BY MR. HALL:

Q    You had previously written, Mr. Pung, to the tax tribunal, is that correct?

A    I had.

61

Q    On one occasion prior to that?

A    One or two, I don't --

Q    Okay.  I'm going to show you first what's been marked exhibit 17 and ask you if you received that and replied to that letter?

(At 2:59 p.m., exhibit 17 identified)

A    I remember receiving it, I'd have to read the whole thing, but yes I got a letter -- I got a couple letters back from them.

Q    Is that one --

A    So I don't deny having gotten that, yes.

Q    I'd like you to make sure that that is a copy of one of them. I brought the same thing I'm sure, right here, so I can look. Yes.

MR. HALL: So we'd move for the admission of exhibit number 17.

MR. COSTANZO: May I take a look.  I have no objection, but I'd like to see it.

MR. HALL: I'd move for its admission; that was 17.

MR. COSTANZO: Yeah, I have no objection.

BY MR. HALL:

Q    Then I'm going to show you what's been marked exhibit number 18 and ask you, sir, if that was a response you received from the tax tribunal from a prior letter that you had sent to them?

A    Yes.

62

(At 3:00 p.m., exhibit 18 identified)

MR. HALL: So I would move for the admission of 18.

MR. COSTANZO: Again, Your Honor, I don't have any objection, may I see it.

MR. HALL: So we're moving for the admission of 18.

MR. COSTANZO: No objection.

MR. HALL: I have no further questions of this witness.

THE COURT: What -- are you asking for admission of these?

MR. HALL: Yes, he's already acknowledged.

THE COURT: Sixteen was admitted?

MR. HALL: Yes, I also move for the admission of 17.

THE COURT: That's a question, 16 has already been admitted?

MR. COSTANZO: I believe.

THE COURT: Yeah I --

MR. HALL: I think so.

THE COURT: All right, I'll admit 16 just so that we're clear, you're in agreement, correct counsel --

MR. COSTANZO: Correct, Your Honor.

THE COURT: -- 16?  And 17 and 18, any objection to those, Mr. Costanzo?

(At 3:01 p.m., exhibit 16 admitted)

MR. COSTANZO: No and I have copies, but may I have

63

the exhibits so I can use them in my examination?

THE COURT: You may.  Sixteen, 17, 18.

MR. COSTANZO: Please.

MR. HALL: So I assume the court would rule that 17 and 18 are admitted?

THE COURT: Seventeen and 18 are admitted. You may proceed.

(At 3:02 p.m., exhibits 17 and 18 are admitted)

CROSS-EXAMINATION

BY MR. COSTANZO:

Q    Thank you, Your Honor.  Mr. Pung, where do you spend most of your time, what residence?

A    Well my legal address is Lake Charlevoix, but since our daughter broke her neck we stay in Alma to take care of her, so legally I'm Charlevoix, but I'm in Alma most of the time.

Q    What is that address in Alma?

A    Fifty-four seventy-five Blue Herron Drive.

Q    Is that where your daughter Kayleigh resides?

A    Yes.

Q    And when did she fracture her neck?

A    July 9, '06.

Q    Just briefly, could you tell the court what her condition has been since that time, what's --

A    Kayleigh is a quadra --

MR. HALL: Your Honor, I'm going to make just one

64

1 objection right now as to relevance.  And I understand the
2 court may want to have these facts, but I want to make the
3 objection.
4      MR. COSTANZO: Your Honor, I think it's relevant in
5 light of the question concerning notice and I'm -- and that's
6 the only reason that we'd bring it up.  I'm going to bring
7 out, I'm assuming, evidence with respect to the situation at
8 the house and how things are run and -- and -- and may explain
9 some of these questions surrounding this -- the notice, that's
10 the reason for the inquiry.
11      THE COURT: I'll overrule the objection, you may
12 proceed.
13 BY MR. COSTANZO:
14 Q  I'm sorry, what is -- what is Kayleigh's condition?
15 A  Kayleigh is a C1, C2, quadriplegic that can't move, swallow,
16 breath, period.  She can't hold her head up, but her mind is
17 perfect.  So we have 12 nurses and my wife and I don't leave
18 the house together, we've been to dinner 12 times in 8 years.
19 One of us needs to be there with the nurses, and because we're
20 there and we have sisters in Mercy in Alma who are doctors
21 that helped us greatly and got other doctors over there, we
22 don't require RN's because we're there and been trained to do
23 the stuff.  And when they can come if we need them then we've
24 been, it's hard to say you've been blessed when your daughter
25 has a broken neck, but we've been blessed.

65

1 Q  Mr. Pung, has that been the situation since Kayleigh came back
2 to the Blue Herron address in 2007 after the accident?
3 A  Yes, we spent seven months in five hospitals.  We came back
4 January 30, '07.
5 Q  Now you yourself, Mr. Pung, you have a hand in several
6 businesses?
7 A  About ten or 12 and really all I'm doing is dissipating assets
8 cause I can't run businesses anymore.
9 Q  Just give the court a rundown, if you would, just the names of
10 the businesses that you have an interest in at this point?
11 A  I own the Comfortable Inn in Alma, I own King Leasing, I own
12 King Cars, I am part owner of (inaudible)… 500, I have
13 Dunmaglas, Dunmaglas Glass Development, I take care of
14 obviously all of Kayleigh's mail and stuff, she's certainly
15 competent to handle it, but somebody has to read.  So I have to
16 make the deposits because she started a foundation for
17 (inaudible)…, she's now raised a million eight to give away to
18 other people that -- for a cure or that don't have the same
19 that she gets.  So I have -- there's always money coming in, I
20 go make those deposits.  I'm not on the board on purpose
21 because it's more (inaudible)… she's got her own board
22 members, but somebody has to do the leg work, so that's what I
23 do.
24 Q  Mr. Pung, is it safe to assume that based on the above that
25 you get a fairly large amount of mail on a daily basis to the

66

1 Pung residence?
2 A  My wife gets this many magazines (witness demonstrates), I
3 don't know why people send that many, but somedays we get this
4 much (witness demonstrates), somedays we get this much
5 (witness demonstrates). But Dunmaglas is a golf course in
6 Charlevoix and we're closed all winter so there's nobody to
7 get the mail so it's better that everything comes to me.  I
8 hate getting all the bills, but it's the only way I'm ever
9 going to get it done, so I get it.
10 Q  Do you get a significant amount of certified letters that have
11 to be signed for?
12 A  No I don't get -- I don't get -- I mean, I've had a certified
13 letter before, but I certainly don't get very many.
14 Q  Who ordinarily -- is there anybody that's designated to get
15 the mail or is it just whoever is there or how does that work?
16 A  No, in our house we have a 40 second rule that I established.
17 Kayleigh's ventilator quit multiple times, you have four
18 minutes and you're dead.  So I set a 40 second rule; if one
19 person walks out of her room somebody else has to be there
20 within 40 seconds.  I know we're humans and that couldn't be,
21 so I know if I say 40 seconds within 2 minutes you're there
22 and you can take care of the problem and save her, which we've
23 done a number of times.  So at our house it's whoever's what -
24 - it doesn't matter what I'm doing, if I'm on the telephone
25 and it's time for something in her room I'm going to her room.

67

1 If somebody is walking down the hall and it's time for a boost
2 you go do it.  If it's time for something else that's what you
3 do, period.
4 Q  How are you related to Timothy Scott Pung?
5 A  Timothy Scott Pung was my nephew.
6 Q  And you are the acting -- the personal representative of his
7 estate?
8 A  I am, and it's still not closed.
9 Q  Could you tell the court just briefly how it was that you came
10 to become the personal representative of the Timothy Scott
11 Pung estate?
12 A  Well the court's very aware of the fact that there was an
13 insurance policy problem and I found out about that and it was
14 going to be Katie, the 21 year old daughter, when Scott died
15 November 25, '04.  So then I agreed to do it and that's how I
16 became because I knew fighting with Finch was not going to be
17 something they were up to.
18 Q  When you say they, who are you talking about?
19 A  Katie or Donna or Mark.
20 Q  And Donna would --
21 A  (Inaudible)… be in the will and Mark being the son that lives
22 in the house and has.
23 Q  Can you testify with respect to whether Donna Marie and Mark
24 Pung have lived continuously at that resident on Saint Andrews
25 as their principal residence since Timothy Scott Pung's death?

68

1  A    Yes they have, and Mark still does.

2  Q    Excuse me?

3  A    Mark still lives there.

4  Q    You -- at some point in time did you receive some notice that

5       the -- well let me ask you this first of all; when Timothy

6       Scott Pung died, did he have the principal residence exemption

7       with respect to that Saint Andrews property?

8  A    Yes, because I started paying the taxes afterwards and it was

9       always there.  And then I got a letter, I think it was in

10      2010, I could pull it out if you need it because that's when I

11      started -- I called Mrs. DePriest that day that I opened it.

12 Q    What did that letter say?

13 A    That they --

14           MR. HALL: Objection, best evidence.

15           MR. COSTANZO: Excuse me?

16           MR. HALL: Objection, the best evidence rule.

17 BY MR. COSTANZO:

18 Q    Let me ask -- let's put it -- that doesn't make that much

19      difference, he's already testified.  You got a letter with

20      respect to the 2007, '08 and '09 taxes?

21 A    Correct.

22 Q    What did you do in response to that letter?

23 A    Immediately called the assessor.

24 Q    Okay.  Based on your conversation with the assessor what did

25      you do?

69

1  A    I wrote down contemporaneous notes that she would rather argue

2       than listen and she told me that she had gone to the house in

3       --

4            MR. HALL: Objection, hearsay.

5            MR. COSTANZO: It could be, Your Honor, I'm not

6       offering it to prove the truth of the matter asserted, I guess

7       it's up to the court.

8            THE COURT: What are you offering it for?

9            MR. COSTANZO: I -- I just asked the question, he

10      responded.  I mean this is not germane, I mean as far as the

11      issues --

12           THE COURT: I'll overrule the objection or I'll

13      sustain the objection.

14           MR. COSTANZO: Okay, Your Honor.

15 BY MR. COSTANZO:

16 Q    Did you at some point have to appeal that denial to the tax

17      tribunal?

18 A    Yes.

19 Q    You attended the hearing at the tax tribunal in February of

20      2012, correct?

21 A    I did.

22 Q    I was there?

23 A    You were there.

24 Q    Ms. DePriest was there?

25 A    She came 15 minutes late.

70

1  Q    And the administrative law judge issued an opinion on March 7,

2       2012?

3  A    He did.

4  Q    If you recall -- let me ask you this; what was your feeling at

5       the -- when you got the opinion on March 7, 2012, with respect

6       to this principal residence exemption?

7  A    I missed that, what?

8  Q    What did you take from the administrative law judge's opinion?

9  A    My nightmare was over, it was a homestead.  He leaned across

10      the desk when she -- she whipped out her rule thing and said I

11      don't have an application and he went like this (witness

12      demonstrates), leaned forward --

13           MR. HALL: Objection, objection, hearsay.  We have

14      the order, we know what it says.  But what happened at the

15      proceedings, without the parties being present is hearsay.

16           MR. COSTANZO: Not offering it again, Your Honor, to

17      prove the truth of the matter asserted.

18           THE COURT: I'll sustain the objection.

19           MR. COSTANZO: Okay, thank you.

20 BY MR. COSTANZO:

21 Q    When was the next time then that you found out that there was

22      something awry that you still had to deal with this question

23      of the principal residence exemption?

24 A    Well I don't remember exactly what they started doing,

25      something for -- they denied it for 2010 and '11 and I was in

71

1       the state of shock.  But I had already hired you before cause

2       we went to the tax tribunal, so you had been in contact with

3       Mr. Pickens and with her and I had with multiple letters, but

4       we got nowhere.

5  Q    Did you appear before this court in February of 2013 regarding

6       the 2010 and 2011 taxes?

7  A    I did.

8  Q    In the meantime, in 2012 did you get anything from the

9       township with respect to the 2012 taxes?

10 A    Well I got the tax bill on December, they send them about the

11      first and I got it -- I don't know whether I got it the third

12      or fifth or whatever, that I paid then -- I paid it on

13      February 13, 2013, and it had the exemption in it.

14

15 Q    So you were granted the principal residence exemption?

16 A    Yes, and I brought a copy of the cancelled check that I wrote

17      that day.  I wrote it before I got there and I walked in with

18      it.  Do you want me to continue or am I supposed to stop?

19 Q    Go ahead, you can stop, I'm going to see if I can grab a --

20 A    So I walked in the office and I handed the lady at the desk

21      the check and the bill and she's looking and she said well

22      something's wrong with the amount and I said did I write the

23      wrong amount because I didn't have another check with me.  And

24      so then I looked again and I said no, it's the right amount,

25      and she said well that's not what's in my computer.  I said

72

1    well I don't know why that would be.  So then she went back

2    and got Pat DePriest and she said that it was revised a few

3    days before. And then a day or two afterwards I got the

4    revision after I had already paid it.  So she said that -- so

5    I thought if they're going to go through this again she's --

6    I'm going to go over to the house and get Mark.  And so I went

7    to Mark's house, picked Mark up, came back and she had said

8    it's on Facebook he was in Denver, he lives in Denver.  So I

9    said --

10           MR. HALL: Objection, hearsay.  I know, I'm sorry,

11    but I can't --

12           MR. COSTANZO: Your Honor, I mean he can object to

13    every little bit of hearsay if he wants to and I think

14    technically he's probably correct.  Except that, Your Honor,

15    has been through this a few times, you know how to syphon off

16    the hearsay from the other, if you want to keep interrupting I

17    guess you can and then, you know, can keep sustaining --

18           MR. HALL: Well I'm trying to be --

19           MR. COSTANZO: -- the objections --

20           MR. HALL: -- expeditious --

21           MR. COSTANZO: -- that's fine.

22           MR. HALL: -- counsel.

23           MR. COSTANZO: But if anybody thinks that what Mr.

24    Pung says that's hearsay is going to affect your decision I

25    think that's ridiculous, but we can keep doing it.

73

---

1           Mr. Pung, you understand things that other people

2    tell you, I guess, that's hearsay so you got to refrain from

3    bringing that up.

4           THE COURT: Well, you know, here -- here is the

5    bottom line, as you well know Mr. Costanzo; If you believe

6    this testimony is relevant she's not been excused from her

7    subpoena, I assume here for you to call.  So I'm going to

8    sustain the objection.

9           MR. COSTANZO: I understand, thank you, Your Honor.

10    Your Honor, I'm going to have these two things marked, and I

11    don't know if you want to go A, B with us or if you just want

12    to continue with the exhibits, the number.

13           THE COURT: We just continue them numerically.

14    BY MR. COSTANZO:

15    Q   Mr. Pung, I'm going to show you what's been marked as exhibit

16       19, ask you to identify that if you can.

17    A   That's the tax bill I received in December of '12, paid the

18       13th of February of March (sic)

19           (At 3:17 p.m., exhibit 19 identified)

20    Q   Does that tax bill have the principal residence exemption

21       granted?

22    A   We were granted the exemption as we should have been.

23    Q   Thank you.

24           MR. HALL: No objection to 19, Your Honor.

25           MR. COSTANZO: I'd move for its admission, Your

74

---

1    Honor.

2           THE COURT: Nineteen is admitted.

3           (At 3:17 p.m., exhibit 19 is admitted)

4    BY MR. COSTANZO:

5    Q   I'm going to show you what's been marked as exhibit 20, ask

6       you again to identify that.

7    A   Yeah, I must have misplaced it or given it -- because I

8       haven't seen this at all, cause I didn't even know how much

9       that 18 mills was.  So --

10    Q   What is it?

11    A   It says -- how much money?

12    Q   No, what is the document I just handed you?

13    A   It says adjusted tax bill.

14           (At 3:18 p.m., exhibit 20 identified)

15    Q   Does that take away the principal residence exemption?

16    A   Yeah, cause it's in their tax in $1,629.00.

17    Q   And when did you receive this?

18    A   The day or two after I had paid.  I paid on the 13th, so I got

19       it on the 14th or 15th.

20    Q   Of what month?

21    A   Mar -- February, because you pay February 14th.

22    Q   Two thousand thirteen?

23    A   Yes.

24    Q   The first notice that you got you would have gotten in

25       December of 2012, the one with the P-R-E-?

75

---

1    A   Yeah, I get that many of them from all over the state (witness

2       demonstrates).

3    Q   Okay.  And then the one you got the adjusted amount you got in

4       February of 2013?

5    A   Correct.

6    Q   Let me ask you this; there's -- it's written adjusted tax bill

7       on the top of that, is that your handwriting or somebody

8       else's?

9    A   It's not mine, no that's not mine.  I think it's the township,

10       I -- I guess that would be hearsay.

11           MR. COSTANZO: I'm going to move for the admission of

12    exhibit 20, Your Honor.

13           MR. HALL: No objection, Your Honor.

14           MR. COSTANZO: Did you get anything else --

15           THE COURT: Twenty is admitted --

16           (At 3:19 p.m., exhibit 20 is admitted)

17           MR. COSTANZO:  I'm sorry, Your Honor.

18    BY MR. COSTANZO:

19    Q   Did you get anything else from the township with respect to

20       the denial or the attempted denial of the 2012 P-R-E?

21    A   No, I never got a denial.

22    Q   Mr. Pung, have you always paid the taxes with respect to the

23       estate property?  In other words was it you --

24    A   On time every time.

25    Q   And did you pay the full amount owing assuming that the

76

1   principal residence exemption applied?

2   A   I did.  I have the cancelled check if you'd like it.

3   Q   I don't think anyone is disputing it.  You wrote a letter that

4       I think maybe -- let me ask you this; you wrote a letter to

5       the Michigan Tax Tribunal in February of 2013?

6   A   I did.

7   Q   Was that in part in response to your meeting with Ms. DePriest

8       and then your receipt of the adjusted bill for the 2012 taxes?

9   A   My letter was predicated on you and I coming here and Judge

10      Chamberlain giving an order that 2010 and '11 were paid.  And

11      then they hired Mr. Hall were going against and so I

12      thought well maybe I could write to the tax tribunal and get

13      somebody to stop this charade.  And of course all this, you

14      know, goes back to the primary thing; Mr. Hall wouldn't accept

15      the court order.

16  Q   Did you get any relief from the tax tribunal --

17  A   No.

18  Q   -- for these issues?  You retained me then to appear with you

19      at the 2013 hearing with respect to foreclosure on the 2010

20      taxes and forfeiture on the 2011 taxes?

21  A   That was before the letter, we were here on February 15th, the

22      letter was February 22nd.

23  Q   Correct.  Then it -- there was a motion for reconsideration

24      filed by Mr. Hall, denied by the court, is that correct?

25  A   I think so, and then you showed up and then he let it come

77

---

1   through or something a month or two later.

2   Q   Okay.  That was appealed, the judge's ruling appealed to the

3       Court of Appeals?

4   A   Yes.

5   Q   You came with me to the Court of Appeals for --

6   A   I was there.

7   Q   -- oral argument on I think January 14th of this year?

8   A   I was there.

9   Q   Mr. Pickens was there?

10  A   Correct.

11  Q   Mr. Hall was there?

12  A   Correct.

13  Q   Did you hear anything about the fact that the 2012 taxes were

14      in foreclosure?

15  A   Zero.

16  Q   Did you have any idea that the 2012 taxes were in foreclosure?

17  A   Absolute emphatic unequivocal no.  And I'll take a lie

18      detector test.

19  Q   If you had any idea that the 2012 taxes were going to be

20      foreclosed on in February of 2015, would you have been at that

21      hearing?

22  A   What -- oh, the one he was talking about --

23  Q   If you had any idea that the 2012 taxes were being foreclosed

24      on would you have been at the hearing in February of 2015?

25  A   Of course, I've never missed any and I have letter after --

78

---

1   all I've done is a war here since 2010.

2   Q   If you had any idea there was a show cause hearing in January

3       of 2015, relative to the 2012 taxes, would you have been

4       there?

5   A   I'd have been there and you would have been with me.

6   Q   When was the first notice that you had that the 2012 taxes had

7       been foreclosed on?

8   A   I'll tell you exactly when, I spent from like the 17th or 18th

9       of April 2015, writing a letter, trying to get all of the

10      facts together, going over all the court things to write to

11      the Union Township board and to the county commissioners of

12      Isabella County to pay us back for this egregious miscarriage

13      of justice.  And so --

14  Q   Let me stop you right there for a second.  That letter that

15      you were writing was that in response to the Court of Appeals

16      vindicating our position?

17  A   Exactly.  Because we had been vindicated so now it's time

18      somebody can remunerate the law bills that I've paid that have

19      exceeded the exemption we should have -- should have had and

20      were entitled are entitled to.  So anyway I formulated

21      this letter, but I'm very busy so it took me three or four

22      days.  Mark and his wife to be, Tia, came for dinner and that

23      was the 22nd, so I had --

24  Q   Of what month?

25  A   Of April, 2015.  I had the whole package together for both the

79

---

1   county commission and for the township board and so I said

2   would you guys hand deliver these, I have to go to Florida in

3   the morning because I'm working on our place to try to get it

4   if we can ever get Kayleigh down there, I'm making it handicap

5   accessible.  So I went to Florida the next morning, came back

6   five days later, I see the mail and I have a letter that I

7   read and I'm in a state of shock.  And then thank God I didn't

8   through the envelope away, I look at the envelope and the

9   envelope is dated the 22nd of April, the letter dated the 2nd of

10  April, the foreclosure the 21st of February, 31st of March is

11  when you could redeem it and they're so proud of telling us,

12  all of these notices, but nobody tells anything about that and

13  they send the letter afterwards.  What good is the letter

14  afterwards?  Can I make another point?  If I would have known

15  that they were taking the house would I be writing the county

16  and the township asking them to give us back our legal fees?

17  Q   Let me ask you another question; if when you were arguing --

18      you were paying me to argue in the Court of Appeals in January

19      of 2015 to save the house based on the 2010 and '11 taxes, if

20      you knew that the 2012 taxes were in foreclosure, would you

21      had me do something about that?

22  A   Of course.

23          MR. HALL: Objection, speculation.

24          THE COURT: Overruled.

25          MR. COSTANZO: Thank you, that's all I have.

80

REDIRECT EXAMINATION

1    MR. HALL: Mr. Pung, do you have a copy of that
2  February letter that counsel -- did you admit that into
3  evidence, that February --
4        MR. COSTANZO: No I do not, but here.  And actually,
5  counsel, I think this was attached to our brief so the court
6  has it.
7  BY MR. HALL:
8  Q  For the record, this is the exhibit that you were referring to
9  before, Mr. Pung?  That's the letter that you had sent?
10 A  Yeah, you showed it to me a few minutes ago.
11 Q  Your counsel had.
12 Q  Pardon?
13 A  Mr. Costanzo did.
14 Q  Okay, that one.
15 Q  So you acknowledge this is the letter you sent in February of
16    2013 to the tax tribunal?
17 A  I thought you were talking about the February, the one we just
18    got done, that April letter.  I understand you now.
19 Q  Okay.  That is the one?
20 A  Correct.
21        (At 3:27 p.m., exhibit 21 identified)
22        MR. HALL: Move for admission of exhibit 21 as well.
23        MR. COSTANZO: No objection, Your Honor.
24        THE COURT: Twenty-one is admitted.

                            81

1        (At 3:28 p.m., exhibit 21 is admitted)
2  BY MR. HALL:
3  Q  Mr. Pung, you certainly knew that these 2012 taxes were in
4    forfeiture status and delinquent and had received at least one
5    of these notices, which was the first notice sent, is that
6    correct?  Did you -- have you received -- do you recall having
7    received this notice at one point in time regarding the
8    delinquent taxes for 2012?
9  A  No I do not.
10       MR. HALL: I apologize, Your Honor, I thought I had
11   this more accessible.  Does the court have the 2012 file with
12   the court, in other words; do you have the 2012 file, is that
13   there?
14       THE COURT: Sure do.
15       MR. HALL: May I use it for a moment?
16       THE COURT: It's in two parts; do you know what
17   you're looking for?
18       MR. HALL: I'm looking for an October 2013 pleading;
19   it would be a motion, our petition.
20       THE COURT: It's probably in there.  At this point
21   I'm going to take about a five minute recess, counsel.
22       MR. HALL: Thank you, Your Honor.
23       (At 3:32 p.m., court in recess)
24       (At 3:48 p.m., court reconvened)
25       THE COURT: File numbers 12-10050-CF, 14-11664-CF.

                            82

1        Mr. Pung, you may return to the witness stand.  The record
2  should reflect counsel and parties are present.  Mr. Hall, you
3  may proceed.
4        MR. HALL: Thank you, Your Honor.
5  BY MR. HALL:
6  Q  Mr. Pung, in the 2013 case your attorney brought forth a
7    petition and order to show cause that was filed with the court
8    on September 3rd, I'm going to show that to you.  You are, in
9    this case, the respondent.
10 A  Yeah, let me read it.
11 Q  Oh yeah.  Well I'm just going to show you one more part.
12 A  Okay.
13 Q  Okay.  I'm going to show you page three, item ten and it's got
14   a little highlight there.  Property tax notice, that they were
15   in forfeiture?
16 A  Yeah, I believe we're in court for that.
17       MR. HALL: Right, we were.  I'm going to show you
18   what's been marked as exhibit 23 and ask if you can identify
19   that as the documents that you received, is it marked at the
20   bottom August 5?  Is that the --
21       THE COURT: Just a minute, backing up there, Mr.
22   Hall.  Your question; was what that he just answered?
23       MR. HALL: He hasn't answered this question.
24       THE COURT: No, I'm going back a question.
25       MR. HALL: Okay, the question was; your -- when your

                            83

1  attorney prepared and filed respondent's petition and order to
2  show cause dated September 30th in the 2013 -- 2012 case, and
3  then I asked him to read paragraph number ten, which he refers
4  to a delinquent property tax notice pertaining -- indicating
5  that the 2010 and 2011 property taxes were in forfeiture.
6        THE COURT: Okay.
7        MR. HALL: That's what I was referring to, now
8  I'm asking him if exhibit 23 is a copy of the document he was
9  referring to at the time.
10       THE COURT:  Okay.
11       THE WITNESS: I'm clueless about this.  He filed the
12   motion for reason it said 2011 and '10 and that things so -- I
13   can't tell you that I never saw this thing, but I have no
14   recollection.
15       MR. HALL: Okay.
16       THE COURT: Did you -- did you -- you earlier
17   testified that you'd paid all taxes, those were in
18   foreclosure, so I'm assuming that foreclosure was over just
19   the exemption?
20       THE WITNESS: Yes.
21       THE COURT: And you testified earlier I believe that
22   you had a cancelled check, I believe it was for the 2012 --
23       THE WITNESS: That's correct.
24       THE COURT: -- tax year?
25       THE WITNESS: That's correct, Your Honor.  I have it -

                            84

1    -
2              THE COURT: And by cancelled do you mean it was
3    negotiated by the township?
4              THE WITNESS: No, they cashed it.
5              THE COURT: Yeah.
6              THE WITNESS: And I brought a copy of the bank
7    record, if you want it.
8              THE COURT: Okay, and that was minus the exemption.
9              THE WITNESS: That was for the bill that I received,
10   the exact amount that I received.
11             THE COURT: And then you got a revised bill?
12             THE WITNESS: Then I got a revised bill after having
13   been there.
14             THE COURT: That added the exemption back in?
15             THE WITNESS: Right.
16             THE COURT: And was that exemption in about -- is it
17   roughly the same amount of money going all the way back to the
18   '09 figures that you were --
19             THE WITNESS: You know, I guess I didn't -- I can't
20   answer what specificity to the amount.  In fact when I saw the
21   $1,600.00 I didn't know whether it was $1,300.00 or $1,800.00,
22   I certainly knew it wasn't $500.00 or $2,500.00.  But the
23   amount wouldn't vary a lot.
24             THE COURT: Okay.
25             THE WITNESS: I was aware that I spent a lot more on

85

1              MR. COSTANZO: Yeah.
2              MR. HALL: Along as I'm not stipulating to something
3    beyond the scope of the fact that the check was in fact
4    negotiated and paid in the amount that he specified.
5              MR. COSTANZO: Let's just take all the guess work
6    out, Your Honor, I don't want to cramp Mr. Hall here with --
7    let me just have this marked.
8              MR. HALL: Are you offering that?
9              MR. COSTANZO: Yes, Mr. Hall.  This is a two page
10   exhibit, previously admitted the first page as the original
11   bill with the P-R-E, but I'm going to admit both, that page
12   and then on the next page you'll see Mr. Pung has a bank
13   record there that just shows that that check was negotiated,
14   the $2,195.26 check that he wrote February 13, 2013.  That's
15   what --
16             MR. HALL: I see it says Charter Township of Union.
17             MR. COSTANZO: Okay?
18             MR. HALL: Fine.
19   BY MR. COSTANZO:
20   Q   Mr. Pung, I'm going to hand you what's been marked as exhibit
21   24, two page document.  Is that first page a copy of what we
22   already offered as an exhibit that shows what you were
23   originally billed for the 2012 tax?
24   A   Yes.
25   Q   With the P-R-E, right?

87

1              the lawyer then I would have paid.
2              THE COURT: Just a moment, Mr. Hall.  You may
3    proceed, Mr. Hall.
4              MR. HALL: I have no further questions, Your Honor.
5                  RECROSS-EXAMINATION
6    BY MR. COSTANZO:
7    Q   Mr. Pung, in light of the court's last question; do you have a
8    copy of that cancelled check?
9    A   I think it's laying over there.
10             MR. HALL: I don't think anybody is in dispute as to
11   the fact that this gentleman paid the amount of the tax up to
12   the P-R-E.  I mean we didn't dispute that.
13             MR. COSTANZO: Well, if they're willing to stipulate
14   that Mr. Pung paid the amount that he was originally billed
15   for the 2012 tax I have nothing further, that -- if they're
16   willing to stipulate to that.
17             MR. HALL: What is the stipulation that we -- that he
18   --
19             MR. COSTANZO: That Mr. Pung paid in February of 2013
20   the amount he was originally billed for the 2012 tax.
21             MR. HALL: My understanding of the facts.
22             MR. COSTANZO: If you stipulate to that then I don't
23   need to enter -- I don't need to get the check entered.
24             MR. HALL: We just talking about the check in
25   payment, is that what you're --

86

1    A   Yes.
2              (At 3:56 p.m., exhibit 24 identified)
3    Q   Okay, the next page is what?
4    A   That's -- I got the bank records to see when they cashed the
5    check.  I wrote it the 13th.  Like I had testified, it cleared
6    the bank on the 15th of February 2015.
7    Q   Fifteen?
8    A   Thirteen, I'm sorry, 2013.
9              MR. COSTANZO: I move for the admission of exhibit
10   24.
11             MR. HALL: I have no objection.
12             THE COURT: Twenty-four is admitted.
13             (At 3:57 p.m., exhibit 24 is admitted)
14             MR. COSTANZO: That's all I have, Your Honor.
15             THE COURT: Did we have -- did you move for 22 and
16   23?
17             MR. HALL: No, Your Honor, I haven't.  I have them
18   both right in my hand right now.
19             THE COURT: Okay.
20             MR. HALL: So I have not yet moved for their
21   admission.
22             THE COURT: All right.  You may proceed.
23             MR. HALL: I have no further questions of this
24   witness.
25             MR. COSTANZO: I'm all set too.

88

1           THE COURT: And you're going to move for --

2           MR. HALL: I'm going to call -- recall my client in

3 rebuttal.

4           THE COURT: Okay.  You may step down.

5           THE WITNESS: Thank you.

6           MR. HALL: Unless you're not rested, sir.

7           MR. COSTANZO: I have no further evidence, Your

8 Honor.

9           MR. HALL: I'll recall Mr. Pickens.

10           THE COURT: Okay, if you'll be sworn, Mr. Pickens.

11           THE CLERK/RECORDER: Do you solemnly swear or affirm

12 the testimony you're about to give in this matter will be the

13 truth, the whole truth and nothing but the truth, so help your

14 God?

15           MR. PICKENS: Yes.

16           THE CLERK/RECORDER: You may be seated.

17           REDIRECT EXAMINATION

18 BY MR. HALL:

19 Q   Mr. Pickens, I'm going to -- I'm showing you what has been

20 marked exhibit 23 and ask if that is a notice that was

21 generated by your office, in fact by you as the treasurer?

22 A   Yes, my office, yeah.

23           (At 3:58 p.m., exhibit number 23 identified)

24 Q   And the date of that notice?

25 A   August 5, 2013.

1 Q   Now exhibit number two is a -- if you'd look at that, that is

2 a generic version of the form of the notice that was mailed to

3 all persons whose property taxes were delinquent for 2012 on

4 August 5, 2013, is that correct?

5 A   That is correct.

6 Q   And exhibit number 23, is that a copy of the actual notice

7 that was sent to the addressee in this case --

8 A   Yes.

9 Q   -- Timothy S. Pung, correct?

10 A   Right.

11 Q   In this case?

12 A   Correct.

13           MR. HALL: All right, move for its admission, Your

14 Honor.

15           MR. COSTANZO: No objection, Your Honor.

16           THE COURT: You're moving for admission of?

17           MR. HALL: Twenty-three, I'm backwards one, I've got

18 one more to do.

19           THE COURT:  All right, 23 is admitted.

20           (At 3:59 p.m., exhibit 23 is admitted)

21 BY MR. HALL:

22 Q   In the same regard I'm going to show you what's been marked as

23 exhibit number 22 and ask if that is again a notice that was

24 generated by your office in the course of the foreclosure of

25 the 2012 property taxes?

1 A   Yes.

2           (At 3:59 p.m., exhibit 22 identified)

3 Q   And exhibit -- exhibit number one is again a generic version

4 of the notice of the notice that was sent out to all property tax delinquent

5 owners --

6 A   Correct.

7 Q   -- for the initial first notice, correct?

8 A   Right.

9 Q   And that one was done in May of 2013?

10 A   May, yes.

11 Q   And is the exhibit number 22 and -- a copy of the actual

12 notice that was mailed out to --

13 A   Yes.

14 Q   -- Timothy S. Pung in the case of this specific property in

15 May of --

16 A   Correct.

17           MR. HALL: -- 2013?  All right.  Move for the

18 admission of 22.

19           MR. COSTANZO: Can I see, counsel?

20           MR. HALL: Oh sure.

21           MR. COSTANZO: I have no objection.

22           MR. HALL: Okay.

23           THE COURT: Twenty-two then is admitted.

24           (At 4:00 p.m., exhibit 22 is admitted)

25           MR. HALL: No further questions of my witness.

1           THE COURT: Any questions?

2           MR. COSTANZO: Just one I think, Your Honor.

3           RECROSS EXAMINATION

4 BY MR. COSTANZO:

5 Q   Mr. Pickens, can I see exhibit number 23. Thank you.  Mr.

6 Pickens, when Mr. Pung gets notice of this -- this was sent on

7 August 5, 2013, right?  I got (inaudible)… show it to you,

8 right?

9 A   Yep.

10 Q   And that list not only 2010 and '11, but also lists 2012 as

11 well, right?

12 A   Anything that's outstanding at that point, correct.

13 Q   Right, but that notice has '10, '11 and '12 on it?

14 A   Ten and '11 as forfeited status and '12 as delinquent, yes.

15 Q   Okay.  At that time the court order -- Judge Chamberlain's

16 order was that 2010 and '11 taxes had been paid in full --

17 A   That is correct.

18 Q   -- correct?  Okay.  When Mr. Pung got that notice he filed or

19 he had me file a petition and order to show cause, right?

20 A   I believe so, that's where this come from.

21 Q   Okay.

22 A   That's why I happen to have an original.  Normally we do not

23 keep original bills for every (inaudible)… that we have, but

24 in this case we had it because of the show cause --

25 Q   Right.

```
 1  A    -- portion.
 2  Q    So when Mr. Pung gets notice of something he responds, doesn't
 3       he?
 4  A    Understand and this is a notice of the process for the ones
 5       that we're talking about today that was stated that you had
 6       received no notices, and here it tells that he did receive a
 7       notice and it's to the same address that we were questioning
 8       earlier.
 9  Q    If you're listening, Mr. Pickens; we said he didn't get a
10       notice of the foreclosure, that is not a notice of the
11       foreclosure, is it?
12  A    It is one of the notices that are prescribed by PA123, yes.
13  Q    Exactly.  That -- that notice says the 2012 is delinquent,
14       right?
15  A    Correct.
16  Q    At that time that 2012 taxes weren't even in forfeiture, they
17       were delinquent.
18  A    But they are part of the process for the 2011 --
19  Q    I understand that, believe me, I understand this real well
20       now.  Two thousand ten, '11 were in forfeiture and
21       foreclosure, 2012 is delinquent.
22  A    As of August 5th, yes.
23                MR. COSTANZO: That's all I have.
24                MR. HALL: Nothing further, Your Honor.
25                THE COURT: You may step down.
```

93

```
 1                MR. HALL: Does the court have that exhibit? Yeah,
 2       okay.  I have no other rebuttal.
 3                THE COURT: All right, counsel, would you approach
 4       the bench?
 5                (At 4:03 p.m., bench conference)
 6                (At 4:19 p.m., court reconvened)
 7                Okay, I've had some discussion up here with counsel
 8       that they will inform the -- each of the clients on and I'm --
 9       this is an issue that is an interesting issue, it's a complex
10       issue and we may end up there are those cases where I say as
11       judge; sometimes I just have to plug my nose and go forward
12       and render a decision.  So I think, and counsel are free to
13       share with what I shared up here with, minus our kibitzing
14       over the last how many years we've been practicing between 34
15       and 44, depending on which one of us it is.  But I, you know,
16       this is from my perspective, an interesting case. Maybe not a
17       case I think ultimately has the the -- there's potential for it
18       not to be what seems to be the fairest result.
19                There is some room for discussion with the parties
20       on settlement I think that everyone would benefit from. And
21       but I also think that applying the law to the facts in this
22       case and getting it right, I want good advocacy here, the best
23       decisions are made from the best advocacy.  Where I'm going
24       with that is I want to give counsel some time to collect their
25       thoughts for closing argument.  I'm going to have them come
```

94

```
 1       back -- have you all come back at 2:30 tomorrow for closing
 2       arguments.  In the meantime counsel will explore with you, and
 3       do as you see fit with it, I don't -- I mean if you can settle
 4       it, retain control over the outcome, that's always the best
 5       result.  But I -- I certainly don't have a problem deciding
 6       any case, tough case, easy case, what seems to be equitable or
 7       inequitable cases.  I've been doing this for 23 years.  But I
 8       think it's important to retain control over the outcome of any
 9       case and I've always instructed clients in the 35 years I've
10       been in this, 36 years going on that I've been in this
11       business, to look hard at retaining control in settling.  To -
12       - to litigants almost in every case they hear that lecture
13       from me.  If you can resolve them you can resolve them, but
14       this will give the parties some time to chat with their
15       counsel about whether or not you can come to some mutual
16       ground that you could get it resolved and if not I'm going to
17       have better arguments tomorrow I think from counsel to make a
18       decision on.
19                I will say this; I am going to take the matter under
20       advisement because there's a number of things that I look --
21       take hard look at, the law in conjunction with the facts as
22       they've been presented to the court today.  So I think
23       everybody is better served and I'll make a better decision if
24       I give counsel a little time to collect their thoughts and
25       bring you back tomorrow at 2:30.
```

95

```
 1                So we'll be in recess 'til then, and if you can
 2       settle it, fine.  If you can't, fine.
 3                MR. COSTANZO: Thank you, Your Honor.
 4                MR. HALL: Thank you, Your Honor.
 5                (At 4:24 p.m., proceedings concluded)
```

96

STATE OF MICHIGAN   )
                    )
COUNTY OF ISABELLA  )


      I certify that this transcript, consisting of 97 pages, is a
complete, true, and correct transcript of the proceedings and
testimony taken in this case by Maegan Long, Court Clerk and
transcribed by Shelly Smalley, CER 8076, on Thursday, August
20, 2015.


Date:<u>November 2, 2015</u>

                         Shelly A. Smalley, CER 8076
                         Isabella County Trial Court
                         300 North Main Street
                         Mount Pleasant, MI 48858
                         989-772-0911

97